CLARK, Justice.[1]
hThe issue presented in these consolidated matters arises from the sale of land to the plaintiff, who later discovered that the land was allegedly contaminated with radioactive material. The plaintiff filed suit against the former landowners and the oil and trucking companies allegedly responsible for the contamination. In the district court, exceptions of no right of action raised by the oil and trucking companies were granted. The court of appeal initially affirmed this decision, but reversed on rehearing.
We granted writs to determine whether a subsequent purchaser of property has the right to sue a third party for non-apparent property damages inflicted before the sale in the absence of the assignment of or subrogation to that right. After review, we find the fundamental principles of Louisiana property law compel the conclusion that such a right of action is not permitted under the law. Instead, the subsequent purchaser has the right to seek rescission of the sale, reduction of the purchase price, or other legal remedies. For the following reasons, we hold the appellate court on Prehearing erred by reversing the district court’s granting of the peremptory exceptions of no right of action on behalf of the oil and trucking companies. Accordingly, we reverse the court of appeal’s decision on rehearing and reinstate the ruling of the district court.
FACTUAL AND PROCEDURAL BACKGROUND
This matter is before the court on an exception of no right of action. Al *253 though evidence is admissible on the trial of such an objection “to support or controvert any of the objections pleaded,” La. C.C.P. art. 931, the only evidence admitted at the hearing in this case was the bill of sale for the property at issue. This bill of sale was also attached to the petition. Consequently, our recitation of the facts is necessarily obtained from the allegations in the petition. “For purposes of the exception all well pleaded facts in the petition must be taken as true.” Harwood Oil & Min. Co. v. Black, 240 La. 641, 649, 124 So.2d 764, 766-767 (1960), swperceded by statute on other grounds, recognized in Salvex, Inc. v. Lewis, 546 So.2d 1309 (La.App. 3 Cir.1989).
On July 15, 2008, Eagle Pipe and Supply, Inc. (“Eagle Pipe” or plaintiff) filed a petition for damages in the Civil District Court for the Parish of Orleans, alleging causes of action for breach of contract, negligence, strict liability, redhibition, fraud and conspiracy in connection with property Eagle Pipe acquired two decades earlier.[2] Named in the petition were four groups of defendants: (1) ten oil companies, collectively referred to as the “Oil Company Defendants;”[3] (2) eight trucking |3companies, collectively referred to as the “Trucking Company/Transporter Defendants;” [4] (3) Robert Bridges, Patsy Tremble Bridges and Edmund J. Baudoin, Jr., collectively referred to as the “Former Property-Owner Defendants;”[5] and (4) ABC Insurance Company, Inc.[6]
According to the petition, more than twenty years ago, on April 22, 1988, Eagle Pipe purchased property in Lafayette Parish from the Former Property Owner Defendants.[7] For several years before the sale, from 1981 to 1988, the Former Property Owner Defendants allegedly leased the property at issue to Union Pipe and Supply, Inc. (“Union Pipe”), which operated a pipe yard or pipe cleaning facility on the property. In conducting its business, Union Pipe allegedly bought, cleaned, stored and sold used oilfield tubing from the Oil Company Defendants. The Trucking Company/Transporter Defendants allegedly transported the tubing from the Oil Company Defendants to Union Pipe’s facilities.
Eagle Pipe asserted that radioactive scale known by the acronym TENORM was removed from the tubing or pipes *254 during Union Pipe’s cleaning process and was deposited onto the surface of the pipe yard, contaminating the soil where Eagle Pipe now conducts its business.[8] Eagle Pipe claimed it became aware of the alleged |4contamination of its property after the Louisiana Department of Environmental Quality (“La. DEQ”) conducted a field interview and found Eagle Pipe to be in violation of a number of TENORM exposure regulations. The La. DEQ allegedly found TENORM exposure levels on the property which exceeded the regulatory criteria for unrestricted use of property and posed a health hazard to both Eagle Pipe and the public. Eagle Pipe asserted subsequent testing by La. DEQ prompted the agency to issue an order for the remediation of the property. Sometime thereafter, Eagle Pipe filed its suit.[9]
The petition alleged Eagle Pipe has never cleaned pipe on its premises. Therefore, the plaintiff asserted all of the TE-NORM allegedly present on the property is the result of Union Pipe’s activities in cleaning hazardous and radioactive contaminated pipe from the Oil Company Defendants, which was transported to Union Pipe’s facilities by the Trucking Company/Transporter Defendants. Eagle Pipe alleged its property has lost all value and is no longer marketable as a result of the long-standing radioactive contamination.
Eagle Pipe alleged a specific cause of action against the Former Property Owner Defendants for redhibition; the other causes of actions are generally asserted | Sagainst all of the defendants.[10] Eagle Pipe asserted that its petition made no claims under federal law; the Louisiana Conservation Act (La. R.S. 30:1 et seq.); or the Louisiana Environmental Quality Act (La. R.S. 30:2001 et seq.).[11]
The defendants filed declinatory, dilatory and/or peremptory exceptions. All of the defendants filed, or joined in, the peremptory exception of no right of action, arguing Eagle Pipe had no right to assert a claim for damage to the property which occurred before Eagle Pipe was its owner. After a hearing on the exceptions, the trial court ruled, inter alia, that the defendants’ exceptions of no right of action be sustained, dismissing Eagle Pipe’s claims with prejudice.
Eagle Pipe filed a motion for new trial seeking, in part, to amend its petition. The trial court denied the motion for new trial. Thereafter, the plaintiff filed an appeal with the Fourth Circuit Court of Appeal. On original hearing, a three-judge panel affirmed the trial court’s ruling on *255 the exception of no right of action by a two-to-one vote. On rehearing before a five-judge panel, the court of appeal majority reversed the judgment of the district court with respect to its ruling on the exception of no right of action.[12]
All of the Oil Company Defendants participating in the courts below and all but two of the Trucking Company/Transporter Defendants filed writs in this court.[13] | (¿These applications were consolidated and granted to review the correctness of the court of appeal’s decision on rehearing.[14] Leave was granted by the court for the filing of several briefs by amicus curiae.[15]
LAW AND DISCUSSION

Standard of Review

At issue in this matter is the correctness of the trial court’s ruling to grant the exceptions of no right of action filed by the Oil Company Defendants and the Trucking Company/Transporter Defendants. We begin our review by acknowledging that an action can be brought only by a person having a real and actual interest which he asserts. La. C.C.P. art. 681. By filing a peremptory exception of no right of action, a defendant challenges whether a plaintiff has such a real and actual interest in the action.[16] La. C.C.P. art. 927(A)(6). At the hearing on the exception of no right of action, the exception may be submitted on the pleadings, or evidence may be introduced either in support of or to controvert the objection raised when the grounds thereof do not appear from the petition. La. C.C.P. art. 931.
“The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit.” Hood v. Cotter, 2008-0215, p. 17 (La.12/2/08), 5 So.3d 819, *256 829. An appellate court reviewing a lower court’s ruling on an exception of no right 17of action should focus on whether the particular plaintiff has a right to bring the suit and is a member of the class of persons that has a legal interest in the subject matter of the litigation, assuming the petition states a valid cause of action for some person. Id.; Badeaux v. Southwest Computer Bureau, Inc., 2005-0612, p. 6-7 (La.3/17/06), 929 So.2d 1211, 1217; Turner v. Busby, 2003-3444, p. 4 (La.9/9/04), 883 So.2d 412, 415-116; Reese v. State, Dept. of Public Safety and Corrections, 2003-1615, p. 3 (La.2/20/04), 866 So.2d 244, 246.
The determination whether a plaintiff has a right to bring an action raises a question of law. A question of law requires de novo review. Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc., 2006-0582, p. 9 (La.11/29/06), 943 So.2d 1037, 1045. Applying this standard of review to the instant matter, we will examine the law de novo to determine whether a purchaser of property may sue a third person for damage which was not apparent at the time of the sale and which was inflicted on the property before the purchase.

Jurisprudence Constante

The Louisiana Civil Code provides there are only two sources of law: legislation and custom. La. C.C. art. 1; see Doerr v. Mobil Oil Corp., 2000-0947, p. 13 (La.12/19/00), 774 So.2d 119, 128. However, legislation is the superior source of law in Louisiana; custom may not abrogate legislation. La. C.C. art. 3, Revision Comments-1987, (d). “Judicial decisions, on the other hand, are not intended to be an authoritative source of law in Louisiana. ... our civilian tradition does not recognize the doctrine of stare decisis in our state.” Doerr, 2000-0947, p. 13, 774 So.2d at 128.[17]
Under our civilian tradition, we recognize instead that “a long line of cases [¿following the same reasoning within this state forms jurisprudence constante.” Doerr, 2000-0947, p. 13, 774 So.2d at 128. This concept has been explained, as follows: “[w]hile a single decision is not binding on our courts, when a series of decisions form a ‘constant stream of uniform and homogenous rulings having the same reasoning,’ jurisprudence constante applies and operates with ‘considerable persuasive authority.’ ” Doerr, 2000-0947, p. 13-14, 774 So.2d at 128.[18] Thus, “prior holdings by this court are persuasive, not authoritative, expressions of the law.” Doerr, 2000-0947, p. 14, 774 So.2d at 129.[19]
With these principles in mind, we will examine the general Louisiana rule that a purchaser of property cannot recover from a third party for property damage inflicted prior to the sale, sometimes referred to as the subsequent purchaser rule. In order to make this examination, we will review the property law precepts that support this rule, and the reasoning and development of the rule over more than a hundred years of jurisprudence.

Subsequent Purchaser Rule

The subsequent purchaser rule is a jurisprudential rule which holds that an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the ab *257 sence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted.
The Oil Company Defendants and the Trucking Company/Transporter Defendants rely upon this rule as the basis of their peremptory exceptions of no right of action. According to the defendants, any alleged damage to the property at issue | noccurred well before Eagle Pipe became owner. The defendants further assert Eagle Pipe cannot show it was the recipient of an assignment or a subrogation of any rights the Former Property Owner Defendants may have against them as alleged tortfeasors.
Eagle Pipe contends the subsequent purchaser rule does not apply here. According to the plaintiff, the rule applies only where the prior damage to property was overt or apparent at the time of the sale. Here, the plaintiff argues the radioactive contamination of the property at issue was not apparent at the time of its purchase. Moreover, Eagle Pipe has asserted its entitlement to damages as the owner of property which is currently being damaged. Finally, the plaintiff asserts that it was subrogated to all of the property rights of the Former Property Owner Defendants through the sale. Alternatively, Eagle Pipe argues that it is a third party beneficiary to contracts entered into between Union Pipe and the Oil Company Defendants.
In order to resolve this matter, it is necessary to examine some fundamental principles of Louisiana property law and how those principles differ from the law of obligations.

Principles of Louisiana Property Law

Property law in Louisiana is a distinct branch of the civil law,[20] dealing with the principal real rights that a person may have in things.”[21] Book II of the Louisiana Civil Code, which sets forth the law of property, is entitled “Things and the Different Modifications of Ownership.” Thus, an “[ajccurate definition of the word ‘things’ is indispensable in view of the fact that only things in the legal sense may be objects of property rights.”[22]
The Louisiana Civil Code classifies “things” into different categories to which | mdifferent rules may apply.[23] The 1978 Revision of the Civil Code uses the word “thing” in both a broad and a narrow sense, depending on whether the thing is or is not susceptible of appropriation or pecuniary evaluation.[24] The first division of things in the Civil Code is into common, public and private things. La. C.C. art. 448. The first two classifications — common and public — encompass the broad sense of a “thing.”[25] However, in most of the codal provisions, the word “thing” is used “in a narrow sense to designate objects susceptible of appropriation and of pecuniary evaluation,” ie. private things.[26] *258 Private things are owned by individuals, other private persons, and by the state or its political subdivisions in their capacity as private persons. La. C.C. art. 458.
The Civil Code provides that a person may have various rights in things. La. C.C. art. 476 describes the various rights in things as: (1) ownership; (2) personal and predial servitudes; and (3) such other real rights as the law allows. Real rights are not defined by the Civil Code, but ownership is. Ownership is defined as “the right that confers on a person direct, immediate, and exclusive authority over a thing.” La. C.C. art. 477(A); see also La. C.C. art. 476, Revision Comments — 1978, (b).[27] The three main elements of ownership are set forth as the rights of use, enjoyment and disposal, |nwithin the limits and under the conditions established by law. /A[28]
The owner of a thing may perform a certain number of juridical acts relating to the thing, all consisting of the transfer
to another, in whole or in part, the right of enjoyment and of consumption that belongs to the owner of the thing. If he transmits ah his right, it is said that he alienates the thing; he performs an act translative of ownership. If he grants merely a right of partial enjoyment of the thing, it is said that he dismembers his ownership. He creates upon the thing a real right of usufruct, emphyteu-sis or servitude.![29]] He is still owner . but his ownership has been dismembered. Somebody else has a part, more or less important, of his rights upon the thing.[30]
Furthermore, “[t]he idea must be thoroughly understood that these various juridical acts are carried out, not upon the thing but upon the owner’s right.” Id. Thus, a real right can be understood as ownership and its dismemberments.[31]
The various dismemberments of ownership also confer real rights on the owner or holder of that right. For example, servitudes are of two types — personal and predial — and they each confer a real right on the holder of the servitude. See La. C.C. arts. 476, 533. A personal servitude is a charge on a thing for the benefit of a person, and is divided in the Civil *259 Code into three sorts — usufruct,[32] habitation,[33] and rights ofjjguse.[34] A predial servitude is a charge on a servient estate for the benefit of a dominant estate, where the two estates belong to different owners, and can be of four types — natural, legal, voluntary, and conventional. La. C.C. art. 654.[35] Mineral rights[36] and building restrictions[37] are further examples of real rights.[38] Some distinguishing features of real rights are that they cannot exist without a determined object,[39] may be asserted against anyone, confer the right of preference[40] and the right to follow,[41] and are susceptible of possession and of abandonment.[42]
This Court has defined a real right as “synonymous with proprietary interest, both of which refer to a species of ownership. Ownership defines the relation of man to things and may, therefore, be declared against the world.” Harwood Oil & Mining Co., 240 La. at 652, 124 So.2d at 767, citing Reagan v. Murphy, 235 La. 529, 541, 105 So.2d 210, 214 (1958), superceded by stahote on other grounds, recognized in Salvex, Inc. v. Lewis, 546 So.2d 1309 (La.App. 3 Cir. 1989). Commentators have discussed the essential quality of ownership, that which distinguishes ownership from other real rights, as “the power of disposing of the thing, by consuming it, by physically destroying it and by transforming its substance.”[43] By contrast, “[a]ll other real rights authorize those in whom they are vested to enjoy the thing of another in a more or less complete manner, but always with the obligation of preserving the substance.” Id.
*260 The domain of property law in Louisiana is generally distinct from the other main branches of the civil law, including the law of obligations. Because we find the plaintiff urges, and the court of appeal on rehearing held, that certain principles of the law of obligations are applicable to this question of property law, we must also examine some principles of the law of obligations.

Principles of Obligations Law

The law of obligations is found in Book III of the Louisiana Civil Code, and is entitled “Of the Different Modes of Acquiring the Ownership of Things.” Whereas property law encompasses the legal relationship which a person has in things, the law of obligations deals with a specific legal relationship between persons. The Civil Code defines an obligation as a “legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee.” La. C.C. art. 1756.
Obligations may arise from contracts and other declarations of will. La. C.C. art. 1757. In a contract of sale, for example, the seller is obligated “to deliver the thing sold and to warrant to the buyer ownership and peaceful possession of, and the [14absence of hidden defects in, that thing. The seller also warrants that the thing sold is fit for its intended use.” La. C.C. art. 2475.[44] Specifically, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold, as follows:
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
La. C.C. art. 2520. Thus, when defects are discovered in a thing sold which were not apparent, or hidden, at the time of the sale, the law of obligations provides to the buyer a cause of action in redhibition and the right to sue for rescission of the sale or for a reduction of the purchase price.
However, the seller owes no warranty for defects in the thing that were known to, or should have been discovered by, a reasonably prudent buyer. La. C.C. art. 2521. When the defects of the thing sold are apparent, the law of obligations does not provide a cause or right of action to the buyer. Thus, the Civil Code makes a distinction between apparent (overt) and non-apparent (hidden) defects in a thing sold, and what rights and causes of action are provided for the buyer/new owner, within the law of obligations.
Obligations may also arise directly from the law, regardless of a declaration of will, in instances such as wrongful acts, the management of the affairs of another, unjust enrichment, and other acts or facts. La. C.C. art. 1757. An example of an obligation that arises as a matter of law is found in La. C.C. art. 2315, which 1 ^establishes the basis of tort liability and provides: “[e]very act whatever of man *261 that causes damage to another obliges him by whose fault it happened to repair it.”[45]
In general, obligations are divided in the Civil Code into “strictly personal,” “heritable,” and “real.” An obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor. La. C.C. art. 1766. An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor. La. C.C. art. 1765. A real obligation is a duty correlative and incidental to a real right. La. C.C. art. 1763.[46] Thus, a real obligation does not exist in the absence of a real right.
Real obligations are pertinent to our discussion of the present issue because a real obligation and real right both attach to a thing. La. C.C. art. 1764, Revision Comments — 1984, (b). La. C.C. art. 1764 explains the effects of a real obligation:
A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect.
But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning 110the thing.
The nature of a real obligation has been thus described:
Real obligations are always duties incidental and correlative of real rights. They are obligations in the sense that they are duties imposed on a particular person who owns or possesses a thing subject to a real right, and they are real in the sense that, as correlative of a real right, these obligations attach to a particular thing and are transferred with it without the need of an express assignment or subrogation. They are also real in the sense that the responsibility of the obligor may be limited to value of the thing.[47]
Both real rights and real obligations may be contrasted with personal rights. The legal right that a person has against another person to demand the performance of an obligation is called a personal right.[48] Distinct from a real right, which *262 can be asserted against the world, a personal right is effective only between the parties. La. C.C. art. 1758.[49] This court has declared that “a personal right ... defines man’s relationship to man and refers merely to an obligation one owes to another which may be declared only against the obligor.” Harwood Oil & Mining Co., 240 La. at 651, 124 So.2d at 767, citing Reagan, 235 La. at 541, 105 So.2d at 214.
In some instances, a real right and a personal right may appear to be the same, but the underlying nature of the rights distinguishes them. For example,
[according to appearances, a usufructu-ary and a lessee seem to have the use and enjoyment of a house in much the same way. But, technically, the usu-fructuary has a right in the enjoyment of a house; the lessee has a right against the owner of a house to let him enjoy it. One has a real right and the other a personal right.[50]
This court has held “[u]nder the civil law concept, a lease [a contract about property] 117does not convey any real right or title to the property leased, but only a personal right.” Richard v. Hall, 2003-1488, p. 17-18 (La.4/23/04), 874 So.2d 131, 145. “That a lease is not a real right under the civil law is well settled.” Reagan, 235 La. 529, 541, 105 So.2d 210, 214. This concept was further explained:
The rights of use, enjoyment, and disposal are said to be the three elements of property in things. They constitute the jura in re: The right of a lessee is not a real right, i.e., a jus in re. In other words, the lessee does not hold one of the elements of property in the thing. His right is a jus ad rem, a right upon the thing.
Reagan, 235 La. at 541, 105 So.2d at 214, citing In Re Morgan R.R. & S.S. Co., 32 La.Ann. 371 (1880).
Real rights, and real obligations pass to a subsequent acquirer of the thing to which it is attached without the need of a stipulation to that effect. La. C.C. art. 1764, Revision Comments — 1984, (c).[51] A personal right, by contrast, cannot be asserted by another in the absence of an assignment or subrogation. La. C.C. art. 1764, Revision Comments — 1984, (d) and (Í).[52]
*263 hsWe now examine the jurisprudential rule at issue in light of the principles of property law and the law of obligations.

Subsequent Purchaser Rule and its Development

a. Clark v. Warner

A hundred and sixty years ago, in Clark v. J.L. Warner Co. et al., 6 La.Ann. 408 (1851), the plaintiff, who had purchased property which included a two-story brick house, kitchen and outhouses, sued the owner of the adjoining property and his lessee, who ran an ice house depot. The plaintiff claimed damage to his house was caused by the pressure, moisture and other destructive effects of the ice on his buildings. The trial court rendered a money judgment in favor of the plaintiff.
This court reversed, finding the district court erred in awarding to the plaintiff all the damages caused to the premises while they belonged to the former property owner, and indeed, to several preceding owners. We held “as to damages actually suffered before the purchase,” general tort principles would require that each preceding owner would have a right to recover for the damages which occurred while he or she owned the premises. Clark, 6 La.Ann. at 409. The claim for damages belonging to each preceding owner was described as “an incorporeal right, and strictly personal property.” Clark, 6 La.Ann. at 409.
This personal right was not explicitly transferred by the former owner in the bill of sale to the plaintiff, as the bill of sale, examined by the court, was found to be in its usual form for the conveyance of real estate and its appurtenances. Consequently, this court held the plaintiff did not have a right to assert a claim for damage to the property before the date of the act of sale whereby he purchased the | ^property, either by operation of law or contract. Clark, 6 La.Ann. at 409. However, since the plaintiff might have been able to furnish more explicit testimony as to any damages actually suffered by him from the time he became the property owner, the court entered a judgment of non-suit against him.
The plaintiff, and the court of appeal on rehearing, have cited to selected language in the Clark opinion as support for the position that a right of action exists for the plaintiff in the present matter. In Clark, we said:
It is true, that the purchaser of property is presumed to purchase all actions appurtenant to the property, and necessary to its perfect enjoyment; but as to damages actually suffered before the purchase, we know of no other principles governing the case than those referrable to this general provision of the code, that every act of man that causes damage to another obliges him by whose fault it happened to repair it. It is a mere corollary, that the reparation must be made to him who suffered the injury. And the principle is strikingly illustrated by this case. The plaintiff, after pos *264 sessing the property twenty months, claims one-third more damages than he gave Mrs. Springer [the immediate former owner] for his lot with all the buildings and improvements. This leads to the impression, that the modicity of the price he gave for the premises may, perhaps, be attributed to their dilapidated and dangerous situation, on account of the erection of the ice house and other causes. It is impossible, from the law, to concur with the district court, that these damages, which probably caused the moderate price given for the house and kitchen, should be a source of profit to the purchaser, who had a perfect knowledge of their existence when he purchased.
Id., 6 La.Ann. at 409.
The plaintiff, and the court of appeal on rehearing, rely on this language to contend and assert, respectively: (1) Eagle Pipe is the only party which has suffered damage because the sellers here, the Former Property Owner Defendants, did not have to accept a reduced price for apparently damaged property; (2) Art. 2315 provides a remedy to a damaged party; therefore, (3) Eagle Pipe has a right of action to seek damages. The plaintiff and the court of appeal on rehearing are in error.
The language in Clark, understood in context and giving effect to subsequent portions of the opinion, as well as principles of property law and obligations law, |2nshows that such an interpretation is unsound. Louisiana law provides that when property is damaged through the actions of another, the owner of the property (obligee) obtains a personal right to demand that the tortfeasor (obligor) repair the damage to the property. La. C.C. art. 2315 (“Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”). This personal right of the property owner arises because his real rights in the ownership of the property have been disturbed— his use, enjoyment or disposal of the property.
The analysis in Clark continued beyond the portion above-cited, making clear that each successive owner of the property was recognized as having a right to sue for the damage to the property which occurred during his or her ownership. This right of action arose when the real rights of the owners were disturbed by the operation of the adjoining business:
The damages which occurred while Her-riman owned the premises, belong to him; a part belongs to Gregg in like manner; and Mrs. Springer is entitled to what happened while she owned the property. Did she or they transfer their claim to damages to the plaintiff? The claim is an incorporeal right, and strictly personal property.
Id., 6 La.Ann. at 409. Clark makes clear that the former property owners still have a personal right of action against a tortfea-sor for the damage he inflicted on the property while they were the owners, despite the fact that they no longer own the property.
Clark explicitly states the personal right of the property owner to demand damages for the injury to the property must be assigned or subrogated if the personal right is to survive a change of ownership in the property:
[The former owner’s] bill of sale to the plaintiff is in the usual form for the conveyance of real estate and its appurtenances. It does not transfer her claim for damages, expressly, nor is there any thing in it which indicates a transfer by implication. The rights and appurtenances mentioned in the bill of sale have always been considered real rights. It does not appear, therefore, either by law *265 or contract, that the plaintiff has 12¾ any claim for damages previous to the 16th of May, 1848, when he purchased the property.
Id., 6 La.Ann. at 409.
The plaintiff in Clark brought suit against a third-party tortfeasor seeking damages for the condition of the property, not a suit against his vendor. We have already discussed that the Civil Code provides a cause of action in redhibition for a buyer who discovers defects in the purchased property which were not apparent at the time of the sale. When the defect is not apparent, the buyer may seek rescission of the sale or a reduction in the purchase price. However, the Civil Code does not provide a cause of action or a right to rescission or a reduction in the purchase price for the buyer against his seller where the damage to the property is apparent at the time of the sale.
Consequently, Clark, who had a “perfect knowledge” of the dilapidated and dangerous condition of the premises when he purchased the property, had no right of action for damages, or for reduction of the purchase price, against his vendor for a breach of the warranty against defects or vices in the thing sold which were known to him at the time of sale. But neither did Clark have a right of action for damages against the tortfeasor responsible for the condition of the property before Clark was the owner. As Clark explains, the apparent damage was taken into consideration for the purchase price and the court would not allow the known damage to be “a source of profit to the purchaser” by allowing the buyer a further right of action against the tortfeasor who damaged the property before his purchase. Clark, 6 La.Ann. at 409. Instead, the personal right of action for damages belonged to the former owners of the property, each having the right of action to sue for damages inflicted on the property during their term of ownership.
The rule enunciated in Clark was described in a subsequent case, as follows:
|22the purchaser of property is presumed to acquire all actions appurtenant to the property, and necessary to its perfect enjoyment; but, as to damages actually suffered by the vendor before the sale, they are personal to him, and cannot be recovered by the purchaser, without an express subrogation.
Payne v. James, 42 La.Ann. 230, 234, 7 So. 457, 458 (1890). This subsequent expression of the rule does not indicate a requirement that the damage to the property be apparent in order for the rule to apply.

b. Other early cases

In Payne, supra, a property owner sold property during the term of a lease. Thereafter, the former owner/lessor sued his former lessees for failure to surrender the leased property in the like condition, good order, and repair in which they received the property. The lessees excepted to the suit on the ground that the lessor had no interest in the value of the repairs which should be made to property he did not now own. The court acknowledged the lessor had an actionable interest in bringing suit on the ground that, owing to the dilapidated condition of the property, which was the result of the lessees’ violation of their obligation, he was compelled to accept a much lower purchase price than the property would have brought had it been in proper repair. Payne, 42 La. Ann. at 233-234, 7 So. at 457. Thus, even though the former property owner no longer owned the property, the court found “such allegations unquestionably disclose an actionable interest in the complaining lessor.” Payne, 42 La.Ann. at 234, 7 So. at 457.
*266 The record further disclosed even stronger grounds on which to base its holding. At the time of the sale, the former owner/lessor specially reserved all his rights and claims as lessor in the act of sale to the new owners, including in explicit terms the right to sue for the recovery from his lessees all damages which the property sustained while in the lessees’ possession prior to the sale. Id., 42 La.Ann. at 234, 7 So. at 458. Payne exemplifies the balance in the former owner’s retention of the personal right to sue for damage to property to compensate for his acceptance of a lower sales price for apparent damage to property inflicted by another.
In Matthews v. Alsworth, 45 La.Ann. 465, 12 So. 518 (1893), property was sold subject to an existing lease. The new owner filed suit against the lessee for a dissolution of the lease based on the lessee’s violation of his obligations, for compensation for the diminution in the value of the property for the lessee’s damage to the property, and for the rent for the year which accrued in the year before the sale. This court found the new owner had no right of action to sue for damages from the lessee for damage to the property before the sale, either under the lease contract or in tort. Instead, the right to sue for damage to the property inflicted before the sale was a personal right of the former owner/lessor which arose from the lessee’s breach of the contractual obligations of the lease during the time the lessee owed those obligations to the former owner/lessor.
The former owner had not assigned or subrogated this personal right to the new owner in the act of sale. The deed contained the following language:
Said lease and all the aforesaid conveyors’ rights in, to, or under the same are transferred hereby, and simultaneously herewith, to the conveyee herein. This conveyance is made with complete transfer and subrogation of all rights and all actions of warranty or otherwise against all former claimants, proprietors, tenants, or warrantors of the property herein conveyed.[53]
By this language, the court held the new owner/lessor was subrogated to the lease provisions, but only from the date of his purchase of the property. “The lessee is liable on the covenants of his lease, and to these, unquestionably, plaintiff [the new property owner] is subrogated from the date of his purchase. By the use of the words ‘right in, to, or under the lease,’ the plaintiff did not become an assignee of damages l^of date prior to the sale.” Matthews, 45 La.Ann. at 469, 12 So. at 519.
The personal right of the owner to sue for damages was not explicitly assigned in the act of sale, and additionally was not an accessory right which passed with the title without description of, or reference to, the claim. In the act of sale, the property was specifically described, and there was no mention of a claim for damages. The court held it could not “presume that there were additional rights in the nature of damages, the deed being silent as to damages.” Matthews, 45 La.Ann. at 469, 12 So. at 519. Matthews reinforces the proposition that personal rights of the former owner do not pass with the property in an act of sale unless specifically assigned or subrogated to the new owner.
Similarly, in Bradford v. Richard, 46 La.Ann. 1530, 16 So. 487 (1894), the court found the new owner of property was not assigned or subrogated to the former owner’s right to sue for damages for the cut *267 ting of timber from the property, which occurred prior to the sale, because such assignment or subrogation was not specifically described in the act of sale. The court noted the new owner’s familiarity with the property and the almost immediate filing of suit after the purchase. The court found that, if the parties to the sale of the property intended for the new owner, and not the property owner at the time the damages were inflicted, to be compensated for the damage to the property via a suit against an alleged tortfeasor, the right to claim damages would have been transferred through assignment or subrogation in the act of sale:
[i]f the price of one dollar per acre is to be considered as a low price for the land, it is to be presumed that the taking off the timber and other damages were estimated in fixing the price, and we cannot believe that the price was so fixed in order to permit the plaintiff to reap a rich reward in the way of profits for damages and loss of timber prior to the sale. If so, the specific claim transferred would have been mentioned.
Bradford, 46 La.Ann. at 1533-1534, 16 So. at 487. Here, as in Clark, the court | ^discussed the presumption that apparent damage to the property is taken into account in negotiating the purchase price, and the fact that a buyer who has obtained a lower purchase price due to apparent damage or deterioration of the property at the hands of a lessee, or third party, will not be entitled to further benefit by the imputation to him of the seller’s personal right to sue for damages.
In examining related jurisprudence, we find the rights and liabilities of the parties are similar to those involving the servi-tudes obtained by railroad companies in appropriation-servitude cases.[54] In McCutchen v. Texas & P. Ry. Co., 118 La. 436, 43 So. 42 (1907), a property owner sued to recover a strip of land which the railroad had used, apparently without expropriation or purchase, for more than twenty years, or to recover its value. Although the court found any right of action had prescribed, the court also held the right to sue for damage to the property did not pass to the property owner with his purchase from the prior owners, since the right was personal to his vendors and the deed by which he acquired the property contained no subrogation to that right. McCutchen, 118 La. at 438-439, 43 So. at 42.
Counsel for the property owner raised an exception to the rule which arises when the entry or taking of the land is in the nature of a trespass, and applies to the demand for the value of the land as distin *268 guished from the claim for damages incidental to such trespass. The court denied the applicability of the exception since |2fithe facts showed the entry was made, and the land was occupied, with the acquiescence of the owner of the property at the time the entry and occupation occurred. McCutchen, 118 La. at 439, 43 So. at 43.
Taylor v. New Orleans Terminal Co., 126 La. 420, 52 So. 562 (1910) is a similar case. Land was taken by the railroad and used for a switch track with the tacit consent of the then-owner of the property. A subsequent property owner sued for the value of the appropriated land and damages. The trial court rendered judgment in favor of the new property owner, but this court reversed, holding:
By defendant’s appropriation with the tacit consent of the owner at the time, the right to the strip of land passed from the owner to the appropriator — the right became segregated from the property, and the owner became a creditor for the value of the property taken.
The right was personal. The owner at the time had a claim personally for the amount.
The purchaser by the act of purchase does not become invested with a right to the value of the property taken unless the right is transferred with the property-
Taylor, 126 La. at 422-423, 52 So. at 562.
In Taylor, however, the railroad had agreed in a deed to a former landowner to make improvements to the property, i.e. to fence and drain the land and to construct crossings. With regard to these claims, the court found the former property owner acquired the right as a servitude for the benefit of the estate and not for his own personal benefit. A servitude, being a real right, follows the property without the necessity of its inclusion in an act of sale, unlike a personal right. As such, the new property owner had a right under the servitude to bring suit for enforcement of the obligations established in the former deed. Taylor; 126 La. at 426, 52 So. at 564. The right followed the property and was not personal to the owner of the property, whomever it might be. Id., 126 La. at 425, 52 So. at 564.
27Gumbel v. New Orleans Terminal Co., 197 La. 439, 1 So.2d 686 (1941), overruled on other grounds, Lake, Inc. v. Louisiana Power & Light Co., 330 So.2d 914 (La.1976), was another case where a railroad company appropriated property without expropriation or payment. The owner of the property and his vendee acquiesced in the railroad’s laying of tracks across the property. Years later, a new owner of the property complained and ultimately filed suit to recover compensation for the value of the land appropriated or damages to his remaining property. This court found neither the landowner at the time the railroad appropriated the property nor his vendee (the plaintiffs vendor) ever assigned or subrogated to the new owner any rights of action against the railroad to recover compensation for the value of the land taken, occupied and used, or for damages for the remaining land. Gumbel, 197 La. at 444-445, 1 So.2d at 687. After reviewing its decisions in McCutchen, supra, and Taylor, supra, the court held:
Under the facts of this case and in view of the foregoing authorities, it is clear that whatever right of action [the owner of the property at the time of the appropriation] had against the defendant for compensation and damages for appropriating his property did not pass to the plaintiff when he purchased the title to the square of ground, because there was neither an assignment nor a subrogation of that right by [the owner of the property at the time of the appropriation] to *269 [the plaintiffs vendor] and by [plaintiffs vendor] to him.
Gumbel, 197 La. at 444, 1 So.2d at 688. So finding, this court affirmed the rulings of the trial court.
c. Prados v. South Central Bell
In Prados v. South Central Bell Tel. Co., 329 So.2d 744 (La.1975) (on rehearing), a property owner leased land to the South Central Bell Telephone Company (“Bell”). In a series of leases, Bell was granted the right to construct improvements on the property, namely buildings, sheds, fences, etc., as well as the privilege of removing them. In a lease terminating in April, 1973, the owner/lessor 12Sagain granted Bell the right to construct buildings and also granted Bell the corresponding “privilege of removing same at the conclusion of this lease or renewals thereof.” Id., 329 So.2d at 745. At that time, the Civil Code required that a lessee restore the property to its owner in its original condition, unless the contrary had been established in the lease contract.[55]
After the lease expired, Bell did not remove the improvements it had made to the property and the ownerfiessor did not request that Bell remove them, either under the terms of the lease contract or the Civil Code. A few months thereafter, the owner sold the property to another. After acquiring title, the new owner demanded that Bell remove the concrete structures and other improvements it had built on the property. When Bell refused, the new owner had the improvements removed and restored the property to its condition at the commencement of the lease.
The new owner filed suit against Bell, seeking to recover the amount which had been necessary to restore the property. Both the trial court and court of appeal held in favor of the new owner, finding he could recover the cost of removing the improvements from the property under the provisions of the lease between his ancestor in title and Bell.[56]
|290n original hearing, this court affirmed, finding the lease provisions imposed real obligations on the property which were consistent with the provisions *270 of the Civil Code regarding a lessee’s obligation to restore property. Upon re-examination, the court found it had erroneously considered the matter in its original opinion as though the property had been sold during an existing lease. Under those circumstances, the new owner would have been bound to perform the obligations of the lessor stated in the lease in the absence of a contrary stipulation, and would have been entitled to receive the benefit of the obligations of the lessee (such as rent) from the time of his acquisition of the property. Id., 329 So.2d at 749. Here, however, the lease between the former owner and Bell expired before the property was sold to the new owner, and the seller conveyed the property free of any lease.
Consequently, the court determined “the question of liability must be resolved in the light of the rules governing the assignment and subrogation of rights.” Id. In other words, in order for the new owner of the property to assert the former owner’s right to insist on Bell’s performance of its lease obligations, the new owner must have been assigned or subrogated to those rights. The court found the nature of the former owner/lessor’s rights, which arose from the obligations found in the lease provisions, were personal rights, rather than real rights, /d[57]
The next step for the court was to determine whether the former lessor/owner |snexpressly assigned or subrogated his personal right to the new owner. The court reviewed the act of sale and found the conveyance and subrogation clauses therein made “no reference to the expired lease, nor to the right of the seller to a restoration of the property to its original state, nor to the right of damages.” Id., 329 So.2d at 750. Instead, the subrogation clause in the act of sale was directed to the rights and actions of warranty against previous owners:
... [the seller] does by these presents, grant, bargain, sell, convey, transfer, assign and set over with full guarantee against all mortgages, liens, claims, evictions, or other encumbrances or alien-ations whatsoever, and with subroga-tions to all her rights and actions of warranty against all previous owners, and with full guarantee of title, unto [buyer]....
Id., 329 So.2d at 749-750. Thus, there was no express assignment to the new owner of the right to sue the former lessee for damages based on violations of the expired lease.
Since there was no express assignment or subrogation of the former owner’s right to sue for damages, the court then questioned whether the personal right was impliedly or tacitly assigned to the new owner as an “accessory” of the land, as the sale of immovable property included its “accessories and dependencies.” Id., 329 So.2d at 750.[58] Moreover, former law ree- *271 ognized an implied assignment of heritable | S1rights from the conveyance of the property to which the rights were attached.[59]
The court held there had been no implied or tacit assignment of the personal right in the act of sale because the law was clear that “accessories” to a sale do not include personal rights belonging to the seller. “Under the article [former La. C.C. art. 2490], however, Accesories [sic] do not include personal rights of the seller.” Id., 329 So.2d at 750. The court cited as authority Gumbel, supra, Clark, supra, and Planiol to hold: “Personal rights belonging to the seller can never be considered as accessories sories [sic] of the immovable sold.”[60]
The court could have ended its analysis at that point, having found no explicit or implicit assignment to the new owner of the personal rights of the former owner to sue for damages against the former lessee. Instead, the court embarked on a discussion of accessory rights, addressing other fact situations where no accessory rights passed in the sale of property without assignment.
First, the court noted that rents which accrued before the sale of property under an existing lease cannot be recovered by the new owner, citing among other cases, the Matthews decision discussed earlier. The court then stated the general rule at issue Isghere: “Likewise, a purchaser cannot recover from a third party for damage to the property incurred prior to the sale.” Prados, 329 So.2d at 750. Cited as authority for this rule were Gumbel, supra; Tay *272 lor, supra; McCutchen, supra; Bradford, supra; and Clark, supra. Next, the court stated the purchaser of immovable property sold during an existing lease acquired no right to sue the lessee for property damage which occurred before the sale. To illustrate this example, the court again referred to Matthews, supra, and included a passage from that opinion which emphasized that a buyer is presumed to buy the accessory rights to property, but does not obtain in the transfer the personal rights of the vendor, acquired by the vendor before the sale, without an express subrogation. See Prados, 329 So.2d at 750-751. Thereafter, the court stated:
The general principle, we think, is that a buyer is presumed to know the overt condition of the property and to take that condition into account in agreeing to the sales price. See LSA-C.C. Art. 2521; Aubry & Rau, Droit Civil Fran-eáis, supra, p. 76 (f.n. 6).
Id., 329 So.2d at 751.
This statement has been widely misinterpreted. The plaintiff and the court of appeal have interpreted this statement as containing the “general principle” of the subsequent purchaser rule itself, ie. that the rule applies only when damage is apparent and when a purchaser has been able to negotiate a lower sales price due to the obvious deterioration or damage to the property. Looking at the court’s statement in context, however, the comment was merely a part of the court’s discussion of accessory rights in a sale of property under an existing lease, the subject matter under discussion.[61]
IsaAt the conclusion of the discussion of accessory rights, the court reaffirmed that the personal right of the former owner obtained under the now-expired lease had not passed to the new owner with the title:
The rationale of the foregoing decisions applies more strongly to the present case. Here, as we have noted, the conveyance was made after the termination of the lease. The property passed to the buyer unencumbered. The right to damages accrued to the lessor prior to the sale. It was a personal right, as distinguished from a real right. Under no sound theory can it be considered as attached to or accessory to the immovable property. Hence, in the conveyance, the plaintiff received no assignment of the right.
Id., 329 So.2d at 751 (emphasis added).
A careful reading of the Prados opinion clearly distinguishes between the discussion of accessory rights and the court’s holding. Only after finding that the new owner did not acquire the former owner’s personal rights explicitly, in the act of sale; implicitly, by a transfer of accessory rights; or under any other theory, did the court state: “We hold that the present owner has no right to recover damages against the former lessee.” Id., 329 So.2d at 751.

*273
d. Post-Prados cases

In St. Jude Medical Office Bldg. Ltd. Partnership v. City Glass and Mirror, Inc., 619 So.2d 529 (La.1993), the owner of property, which included a medical office building and retail complex, sued its contractor and others for construction defects. The owner defaulted on its mortgage and the mortgagee obtained a judgment in its favor. The building was seized when the mortgagee executed on its judgment.
After the building was seized, the mortgagee petitioned to intervene in the [.^owner’s suit against the contractors after purchasing the property at judicial sale, asserting its right as the new owner to sue third parties for damage to the property which occurred before its purchase. In making this claim, the mortgagee/subsequent owner relied on jurisprudence from this court which held: “that a subsequent purchaser was subrogated to the implied warranty of materials and workmanship in a building contract. Despite lack of privity, the purchaser of immovable property was allowed to enforce a property improvement contract made by the previous owner.” St. Jude, 619 So.2d at 531.[62]
This court denied the subsequent purchaser’s claim and held the mortgagee’s authority was based on law which had since been repealed.[63] In addition, the court found the mortgagee purchased its building and property at a judicial sale and knew of the defects in the building at the time of the purchase. On both of those grounds, |3Bthe court noted the mortgagee had no right to seek redhibition. Id.[64] Finding the underlying obligation in the construction contracts was a personal right and not a real right in the property, the court held the mortgagee had no right of action to intervene in the former owner’s suit in the absence of a stipulation or assignment. Id. St. Jude reaffirmed the general rule that, in the absence of an assignment or subrogation, “a purchaser *274 cannot recover from a third party for property damage inflicted prior to the sale.” Id., 619 So.2d at 530.
Another source of confusion in the interpretation of the subsequent purchaser rule was inadvertently engendered by our brief per curiam opinion in Hopewell, Inc. v. Mobil Oil Co., 2000-3280 (La.2/9/01), 784 So.2d 653. The underlying facts of the case are presented in its appellate decision.[65] Briefly, in 1921, the Pugh family granted to Fortuna Oil Company (“Fortuna”) the right to construct a casing head gas plant on a 70 acre tract of land. Fortuna already owned a mineral lease on this tract. In 1922, the Pughs sold to Fortuna the surface rights, as well. Oil and gas operations were conducted on the property by Fortuna. Fortuna subsequently sold the property to Magnolia Oil Company (“Magnolia”). The 70 acre tract was later conveyed back to the Pugh family in 1945 in settlement of a lawsuit with Magnolia. Thereafter, the Pughs leased the surface rights back to Magnolia. The gas plant ceased operations in the 1950’s. At some unspecified time, Mobil Oil Co. (“Mobil”) acquired Magnolia and assumed its liabilities.
Hopewell, Inc. (“Hopewell”) purchased a 442 acre tract from the Pugh family in 1994, which included the 70 acre tract already discussed. On January 2, 1997, Hopewell filed suit for damages against Mobil and the Pugh family, contending the IsfiProperty was contaminated by hazardous and toxic substances deposited on the ground during the former oil and gas operations conducted on the property.
Mobil filed, inter alia, an exception of no right of action, contending the right to recover for damage to the property was personal to the owner of the property at the time the damage occurred and did not transfer with the sale to Hopewell. The trial court denied Mobil’s exception of no right of action, but the court of appeal reversed. The court of appeal explicitly found the holding in Prados was controlling, and that the right to recover for damages was personal to the owners of the property at the time the damage occurred.[66] Hopewell sought writs from this court, which were granted. Thereafter, the court issued a brief per curiam opinion reversing the court of appeal:
Granted. Judgment of the Court of Appeal is reversed. Judgment of the trial court denying defendant’s exception of no right of action is reinstated. Prados v. South Central Bell Telephone Company, 329 So.2d 744 (La.1975) (on rehearing), which the Court of Appeal relied upon, involves rights arising under a lease and is distinguishable from the instant facts. Case remanded to the trial court for further proceedings.[67]
Hopewell has been cited as authority by lower courts, and the court of appeal in this case, for the proposition that Prados is limited to actions for damages by a subsequent purchaser against a former lessee for damages arising out of violations of a lease, and where the damage to the property is apparent. Such an interpretation is a misunderstanding of the very limited nature of the Hopewell ruling due, admittedly, to the abbreviated nature of the per curiam.
Although the per curiam mentions the facts of Hopewell are distinguishable, the brief ruling does not articulate what the distinguishing facts may be. Hopewell *275 was never intended to repudiate the central holding in Prados, or to limit that holding to damage claims against former lessees or where the damage to property is apparent. 137To the extent Hopewell has been so interpreted, that interpretation is expressly renounced.
Finally, in Marin v. Exxon Mobil Corporation, 2009-2368 (La.10/19/10), 48 So.3d 234, this court granted writs, in part, to consider the very question presented in the instant matter: “whether a subsequent purchaser has the right to sue for property damages that occurred before he purchased the property, particularly where the damage was not overt.” Id., 2009-2368, p. 32 n. 18, 48 So.3d at 256 n. 18. The court did not reach the issue in Marin, however, because the court found, even assuming a right as a subsequent purchaser to sue in tort for property damage, the right had prescribed. Id. Consequently, writs were granted in the instant matter to consider the unanswered question.

Analysis

Although the plaintiff asserts the subsequent purchaser rule applies only when there is apparent damage to property, we think the rationale also extends to the situation where the damage to property is not apparent. Whether this should be called an extension of the subsequent purchaser rule, or simply the way in which the fundamental principles of property law operate, the result is the same. Damage to property may disturb not only the owner’s rights of use of, and enjoyment in, the property (the usus and fructus rights in ownership), but may also disturb his right to alienate the property, or to dispose of the property, completely and without disturbance (the abusus right in ownership).
The property owner at the time the damages were inflicted has a personal right of action against the tortfeasor for the disturbance of his real right in the property. When the damage is apparent, the property owner obtains the personal right of action to sue for damages to compensate for a loss of value in the property or an interference |sswith the property’s use. This personal right exists during his use and enjoyment while he owns the property. This personal right exists even during and after his disposal of the property, as it is assumed the apparent damage would result in a loss of value to the property which would be reflected in the sale price. Where damage to the property is not apparent, and the property has been sold, the law provides the purchaser with the right to seek rescission of the sale or a reduction in the purchase price. In that instance, the former owner’s right to dispose of the property without disturbance has been affected, as the owner must now defend against an action in redhibition or take some other action to repair, remedy or correct the defect.[68]
*276 With apparent damage to property, the law does not provide to the subsequent purchaser a source of profit by allowing him to negotiate a low purchase price based on the condition of the property and the right to seek damages from the tort-feasor who is responsible for the property’s poor condition. With damage that is not apparent, the law does not provide the subsequent purchaser with both the right to sue for rescission of the sale, or a reduction in the purchase price, and the right to sue for damages against the tort-feasor. Instead, whether damage to the property is apparent or not, the personal nature of the right of the landowner at that time does not change, and remains with the landowner unless the right is explicitly assigned or subrogated |3Sto another.
We are not unaware of the effects which the rules of discovery and prescription will have on certain fact situations under this analysis,[69] especially where the damage to property occurred in the distant past, where property rapidly changes hands, or where ancestors in title are non-existent.[70] We find the rules of discovery and prescription are deliberate legislative choices which ultimately limit otherwise impre-scriptible torts and which maintain certainty in transactions involving immovable property. The legislature, if it chose, could have created a right of action to seek damages against tortfeasors for damage to property which affects current property owners no matter when the damage occurred, or could have made an exception to prescription rules for long-term contamination of property. But such legislation has not been enacted. Instead, the legislature has decided the only addition to current legal remedies is a mechanism for remediating the property.[71]
Nor are we indifferent to criticisms of the remediation procedures of the La. DEQ raised by the plaintiff and amicus curiae. However, these assessments of the current legislative scheme for property remediation are also matters best addressed to the legislature. What we discern from the current legislative scheme is a determination by the legislature to remediate property to put it back into use and commerce.[72] In the absence of legislative action, we cannot supply a right of action Rpthrough jurisprudence which the law does not.
With this analysis of the law in mind, we review the reasoning of the court of appeal de novo.

Court of Appeal Opinion

On original hearing, before a three-judge panel, the Fourth Circuit denied the plaintiffs claims under both tort and con *277 tract theories.[73] Citing to the general rule, the appellate court held Eagle Pipe could not assert a right of action under tort principles. The court of appeal noted the act of sale did not explicitly include an assignment of the former owner’s personal right to damages and correctly interpreted that Hopewell had not changed the law. The court of appeal also denied any exception to the general rule based in trespass under the facts presented here.
Next, the court of appeal considered and rejected Eagle Pipe’s contentions of entitlement to a right of action as a third party beneficiary. The court found Eagle Pipe failed to identify a contract or contracts which established its status as a third party beneficiary. Instead, the allegations cited in the petition referenced benefits incidental to the contracts discussed. The court additionally found that any obligation to repair the land which might have been found in contracts entered into by the Oil Company Defendants was a personal right which inured to the previous landowners, which was not assigned to Eagle Pipe. Consequently, on original hearing, the court of appeal found no abuse of the trial court’s discretion in denying the plaintiffs motion for new trial which sought leave to amend the petition, finding: “[t]here are no facts to cure the causes of action alleged in the petition because the causes of action pertain to alleged damages to the land prior to Eagle’s ownership and Eagle | slacks an assignment of rights.”[74]
Rehearing was granted before a five-judge panel. The opinion on original hearing was vacated and a new opinion on rehearing was rendered. Based on our review of the jurisprudence and the law discussed herein, we find the reasoning of the court of appeal on rehearing to be fundamentally unsound.
The rehearing panel majority found that our brief per curiam in Hopewell changed the law, limiting Prados to fact situations where a subsequent purchaser files an action against a former lessee arising out of a terminated lease. Moreover, the court of appeal, in failing to read Prados carefully, relied on the “general principle” in the discussion of accessory rights as authority to find the subsequent purchaser rule did not apply where damage to property was not apparent at the time of its sale. As our previous analysis shows, the Fourth Circuit’s analysis on rehearing with regard to our holdings in Hopewell and in Prados was flawed.
The rehearing panel majority next failed to thoroughly read Clark, as has already been discussed; the court of appeal on rehearing held that where there is injury, there must be reparation in the form of a tort right of action. Although La. C.C. art. 2315, the general authority for tort liability, was discussed in Clark as the basis for the subsequent purchaser’s claim, the rest of the analysis in the Clark opinion made clear that each succeeding owner had the right of action to sue for damages inflicted on the property while he or she was the owner, that this right was a personal right, and that the right remained with each owner unless assigned.
The court of appeal on rehearing approached the present problem by focusing on the concept of injury, rather than analyzing the current matter under the principles of Louisiana property law or understanding that under Louisiana law the damage to l42property is considered as damage to the owner’s rights in the property. In support of its flawed reasoning, *278 the rehearing panel majority undertook the novel, although incorrect, approach of relying on jurisprudence regarding the occurrence of property damage under contractual language in insurance cases.[75] While this analysis may have superficial appeal, it is not the correct approach to resolve the present issue.
Finally, the court of appeal on rehearing confused the right to bring an action with a cause of action. In the first of its four “findings,” the rehearing panel majority held: “(1) the manifestation of radioactive contamination allegedly caused by defendants constitutes an injury giving rise to a legitimate cause of action....”[76] What is at issue here is whether Eagle Pipe has the right to bring a suit seeking damages for injury to its property which occurred before the plaintiff became owner |4Sof the property. The court of appeal’s focus was incorrect.
For the foregoing reasons, we find the ruling of the court of appeal on rehearing was erroneous. We now turn to our own review of the plaintiffs claims.

Allegations of the Petition

Reviewing the allegations of the petition de novo, and assuming the petition states a valid cause of action for some person, we must now determine whether the plaintiff belongs to the class of persons to whom the law grants the causes of action asserted in the suit. In reviewing the causes of action asserted by the plaintiff, we find they fall into two general categories, those arising in tort and those arising under contract.

*279
a. Tort claims

Eagle Pipe raises a tort cause of action, claiming the defendants are strictly liable and liable for their negligence in damaging the property. Eagle Pipe claims a right of action as the current property’s owner who is injured by the contamination of the property by TE-NORM. Although Eagle Pipe argues the distinction between real and personal rights is irrelevant, our analysis shows that this distinction is at the very core of the Louisiana property laws which resolve this dispute.
As we have explained, injury to property must be understood as damage to the real rights in the property. A tortfeasor who causes injury or damage to a real right in property owes an obligation to the owner of the real right. This relationship arises as a matter of law and provides to the owner of the real right a personal right to sue the tortfeasor for damages. In the absence of an assignment or subrogation of this personal right, a subsequent purchaser of the property cannot recover from a third party for property damage inflicted prior to the sale. Insofar as Eagle Pipe claims a right to sue based on the damage to the property which occurred before its ownership, |44we hold the plaintiff has no right of action to assert as a matter of law.
To the extent the plaintiff claims the damage to the property is continuing, such that Eagle Pipe asserts its own right of action to sue for damages, we find the law is clear that the allegations of the plaintiffs petition cannot constitute a continuing tort. In Crump v. Sabine River Authority, 98-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726, this court noted “the theory of continuing tort has its roots in property damage cases and requires that the operating cause of the injury be a continuous one which results in continuous damages.” We have held “[a] continuing tort is occasioned by continual unlawful acts and for there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant.” Id., 98-2326, p. 10, 737 So.2d at 728.
The inquiry as to whether there is continuous tortious conduct “is essentially a conduct-based one, asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts.” Hogg v. Chevron USA, Inc., 2009-2632, p. 16 (La.7/6/10), 45 So.3d 991, 1003. In Hogg, we cited with approval the following analysis:
... courts look[ ] to the alleged injury-producing conduct of the tortfeasors to determine whether that conduct was perpetuated through overt, persistent, and ongoing acts. Where the wrongful conduct was completed, but the plaintiff continued to experience injury in the absence of any further activity by the tortfeasor, no continuing tort was found. Id., 2009-2632, p. 21, 45 So.3d at 1005.
We find the operating cause of the injury claimed in the petition here was the tender of allegedly contaminated oilfield equipment from the Oil Company Defendants and the Trucking Company/Transporter Defendants to Union Pipe, the lessee of the Former Property Owner Defendants. The petition does not claim that there have been continual or ongoing unlawful acts; instead, the petition asserts the alleged tortious acts ceased as of 1988. We also find the continued presence of the ^alleged contamination, the injury claimed, is simply the continuing ill effect from the original tortious acts. Crump, 98-2326, p. 9, 737 So.2d at 727-728. The fact that a subsequent purchaser “discovers” the continuing ill effects of the original tortious acts does not give rise to a new, discrete right of action in tort.
*280 Similarly, to the extent the allegations in the petition could be construed to assert a cause of action under trespass, as alluded to in the plaintiffs brief and urged by amicus, we find the law does not extend a right of action to Eagle Pipe under the facts alleged. The plaintiff cites to McCutchen, supra, where this court noted in ruling that the current landowner could not recover for damages to the land that occurred prior to purchase that “[t]he exception to this rule (to which the learned counsel calls attention) arises when the entry or taking of land is in the nature of a trespass, and applied to the demand for the value of the land as contradistin-guished from the claim for damages incidental to such trespass.” 118 La. at 439, 43 So. at 42 (parenthetical in original).[77] However, Eagle Pipe does not include the court’s conclusion in McCutchen, which found: “[i]n the instant case we find as a fact that the entry was made and the land occupied with the acquiescence of the owner. The case does not, therefore, fall within the exception.” Id.
A civil trespass is a tort. Even if the facts alleged in the petition could be considered tortious acts which constituted a trespass which caused damage to the property, the principles of Louisiana property law would still provide the owner of the property at the time the injury occurred with a personal right to sue the trespasser for damages, and not the subsequent owner. Moreover, not all trespasses are continuous acts giving rise to successive damages.
In Hogg, we observed “the concept of continuing tort finds its origins in | .^trespass and nuisance cases.” Id., 2009-2632, p. 16, 45 So.3d at 1003.
A continuous trespass is a continuous tort; one where multiple acts of trespass have occurred and continue to occur; where the tortious conduct is ongoing, this gives rise to successive damages .... That situation, our courts have cautioned, is to be distinguished from a trespass which causes continuing injury by permanently changing the physical condition of the land. When a trespass which permanently changes the physical condition of the land is concluded, no additional causes of action accrue merely because the damage continues to exist or even progressively worsens. Id., 2009-2632, p. 17, 45 So.3d at 1003 (citation omitted).
Thus, to determine whether a trespass is continuous, a court must use the same inquiry used to determine the existence of a continuing tort. As we have already seen, the injury alleged in the petition was not perpetuated through overt, persistent, and ongoing acts. Consequently, even if the allegations in the petition could be considered as asserting a trespass claim, Eagle Pipe would not have a right of action to assert that claim.
Finally, Eagle Pipe relies upon a Civil Code comment for the proposition that “the obligation ... to restore the premises to their previous condition is a real obligation, following the immovable into the hands of any acquirer.” La. C.C. art. 1764, Revision Comments — 1984(f). Although the language used in the comment certainly appears to provide relief for the plaintiff, a closer look at the paragraph in which this statement is made and the authorities cited for the proposition reveal the comment is referring to a real obligation to restore premises correlative and incidental to a predial servitude. See Yiannopoulos, Predial Servitudes, § 157 (3d ed.2004). The paragraph in which the relied-upon statement appears is a discussion of the effects of real obligations in *281 connection with predial servitudes.[78] Consequently, 147Eagle Pipe cannot assert a right of action under these provisions.

b. Contract claims

We have already found, absent assignment or subrogation, Eagle Pipe as a subsequent purchaser of the property does not have a right to assert a claim for damages which were inflicted on the property before the sale. Consequently, we must examine the act of sale to determine whether the Former Property Owners Defendants explicitly assigned their personal right to sue for damage to Eagle Pipe. The act of sale was attached to the petition and was offered as an exhibit at the hearing on the exceptions. In pertinent part, the act of sale provides:
... [the sellers] do by these presents sell, transfer and deliver, with full guarantee of title and free from all encumbrances, and with full subrogation to all their rights and action of warranty against previous owners ...[79]
We And these provisions are substantially similar to those found in Prados, supra, in which we stated the subrogation clause in the act of sale was directed to the rights and actions of warranty against previous owners, and not an express assignment or subrogation of personal rights to the new owner. Prados, 329 So.2d at 749-750. Likewise, we find no express assignment or subrogation of the former property owners’ personal right to sue for damage in the act of sale at issue here. Consequently, Eagle Pipe has no right of action based on an assignment of personal |4Srights from its vendor.[80]
Eagle Pipe contends that' Union Pipe and the Oil Company Defendants en *282 tered into conflicts, obligations or agreements that provide for the recovery of damages caused to the property. This contention suggests earlier contracts between the lessee and its customers established a real obligation which followed the property. However, a real obligation is correlative and incidental to a real right. Although Union Pipe as lessee had a right against the Former Property Owner Defendants to use and enjoy the property during the term of its lease, Union Pipe did not have a real right in the property. The Former Property Owner Defendants retained the real rights to use and enjoy the property, while the lease provided Union Pipe with a personal right against the owners to allow it to use and enjoy the property. The contracts between Union Pipe and the Oil Company Defendants, therefore, could not involve any real right in the property. It is a fundamental principle that “no one can transfer a greater right than he himself has.” [81] If there was no real right involved in the contracts between Union Pipe and the Oil Company Defendants, then there could be [^established no real obligation which was correlative and incidental to that real right. Instead, the contractual rights and obligations between Union Pipe and the Oil Company Defendants established personal rights between the contracting parties. Eagle Pipe does not have a right of action based on a real obligation established by an earlier contract between a lessee of the property and its customers.
Eagle Pipe also contends that Union Pipe entered into contracts with its customers by which the Oil Company Defendants obligated themselves to provide certain health and safety conditions and notices. Eagle Pipe asserts these contracts were similar in nature to contracts entered into by other oil companies and pipeyards. Eagle Pipe asserts it is a third party beneficiary to such contracts, and as such, has the right to demand performance from the Oil Company Defendants. The petition recites portions of these other alleged contracts which purport to show the assumption by other oil companies of “specific health and safety obligations” and “... in providing healthy and safe working conditions with adequate environmental and pollution controls....”[82]
La. C.C. art. 1978 provides: “A contracting party may stipulate a benefit for a third person called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary’s agreement.” This court has held “such a contract for the benefit of a third party is commonly referred to as a ‘stipulation pour autrui.’ ” Joseph v. Hospital Service Dist. No. 2 of Parish of St. Mary, 2005-2364, p. 7 (La.10/15/06), 939 So.2d 1206, 1211.[83] While the Louisiana *283 Civil Code recognizes the existence of a third party beneficiary contract, the code provides few governing | anrules. Id., 2005-2364, p. 8, 939 So.2d at 1211.[84] Instead, “[e]ach contract must be evaluated on its own terms and conditions in order to determine if the contract stipulates a benefit for a third person.” Id., 2005-2364, p. 8, 939 So.2d at 1212.
In order to help with this determination, we found:
[o]ur study of the jurisprudence has revealed three criteria for determining whether contracting parties have provided a benefit for a third party: 1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided the third party; and 3) the benefit is not a mere incident of the contract between the promisor and the promisee. In applying these criteria, we ultimately rely on the words of Article 1978 that the contract must “stipulate a benefit for a third person.” Id., 2005-2364, p. 8-9, 939 So.2d at 1212.
In addition, a stipulation pour autrui can never be presumed and the party claiming its benefit bears the burden of proof. Id.
Putting aside requirements of proof, and assuming that such contracts exist and contain the language described, we find no clear manifestation of a stipulation for the benefit of a third party such as Eagle Pipe.[85] The language cited in the petition shows, if the contracts contained a stipulation for the benefit of third parties, the benefit was intended for the employees and subcontractors of the pipeyards entering into these contracts with the oil companies, and not for a subsequent purchaser of the property. Likewise, we find the benefit which was intended to accrue to these beneficiaries was for the health and safety of the workers. Finally, we find that any benefit which Eagle Pipe derives from these provisions of the contracts between Union Pipe and its customers would be incidental to the contracts themselves, inasmuch as any person coming into contact with land has an interest in the land not being contaminated.[86]
IsiOur analysis of the three criteria for determining whether contracting parties have provided a benefit for a third party like Eagle Pipe leads us to conclude that Eagle Pipe does not have a right of action to assert on this basis. “A person may derive a benefit from a contract to which he is not a party without being a third party beneficiary.” Joseph, 2005-2364, p. 12, 939 So.2d at 1214. The contracts between Union Pipe and its customers encompassed the personal rights and obligations of the contracting parties, but failed to include provisions for third party beneficiaries like Eagle Pipe.
CONCLUSION
Under the facts alleged in the petition, the law has provided to Eagle Pipe a cause of action in redhibition and the right to sue for rescission of the sale or the reduction of the purchase price. In addition, the legislature has provided a mechanism for Eagle Pipe to obtain remediation of the *284 property. While the law provides Eagle Pipe a contractual remedy, and the legal remedy of remediation, the law is not required to provide Eagle Pipe with every possible remedy. PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058, 1061 (La.1984) (“... the rule of law which prohibits negligent damage to property does not necessarily require that a party who negligently causes injury to property must be held legally responsible to all persons for all damages flowing in a ‘but for’ sequence from the negligent conduct.”) (emphasis in original). Our de novo review of the allegations in the plaintiffs petition shows that Eagle Pipe does not belong to the class of persons to whom the law grants the causes of action asserted in the suit.
DECREE
So finding, we reverse the ruling of the court of appeal on rehearing and | ^reinstate the ruling of the court of appeal on original hearing, affirming the trial court’s granting of the defendants’ exceptions of no right of action.
REVERSED.
Retired Judge ROBERT J. LOBRANO, assigned as Justice ad hoc, sitting for Justice JEANNETTE T. KNOLL, recused.
JOHNSON, Justice, dissents.
VICTORY, Justice, concurs in the result and assigns reasons.
WEIMER, Justice, dissents and assigns reasons.
GUIDRY, Justice, concurs and assigns additional reasons.
LOBRANO, Justice ad hoc, dissents for the reasons assigned by WfEIMER, J.
CLARK, Justice, concurs and assigns additional reasons.
WTEIMER, J., assigns additional reasons for his dissent.
LOBRANO, J., ad hoc, joins in the additional reasons for dissent by Justice WEIMER.

. Retired Judge Robert J. Lobrano, assigned as Justice ad hoc, sitting for Justice Jeannette T. Knoll, recused.

. See Petition, ¶¶ VII(l-8); Vol. 1, p. 6-8.

. The Oil Company Defendants named in the petition are: (1) Hess Corporation f/k/a Amer-ada Hess Corporation; (2) Chevron U.S.A. Inc.; (3) Exxon Mobil Corporation; (4) Kerr-McGee Oil & Gas Corporation; (5) OXY USA, Inc., individually and as successor in interest to Placid Oil Co.; (6) Shell Offshore, Inc.; (7) Shell Oil Company; (8) SWEPI, LP; (9) Stone Oil Company; and (10) Berry Petroleum Company. See Petition, ¶¶ 11(1 — 10); Vol. 1, p. 1-3. The record does not reflect that Stone Oil Company filed an answer or exceptions to the petition. When the defendants are referred to collectively in this opinion, it should be understood that the reference is only to those defendants who responded to the petition by filing answers and/or exceptions.

. The Trucking Company/Transporter Defendants named in the petition are: (1) Intracoastal Tubular Services, Inc., f/k/a Intracoastal Truck Lines, Inc.; (2) Walker Trucking, Inc.; (3) Patterson Truck Line, Inc.; (4) Packard Truck Lines, Inc.; (5) Acme Truck Lines, Inc.; (6) Ace Transportation, L.L.C.; (7) Dynasty Transportation, L.L.C.; and (8) Venture Transport Logistics, L.L.C., individually and as successor in interest to Venture Transport Logistics Holdings, L.L.C. See Petition, ¶¶ IV(1 — 8); Vol. 1, p. 4-5.

. See Petition, ¶¶ 111(1-3); Vol. 1, p. 3-4.

. See Petition ¶ V(l); Vol. 1, p. 5.

. The factual basis for the plaintiff's claims are found in ¶¶ VIII(l-42) of the Petition; Vol. 1, p. 9-20.

. The acronym TENORM stands for "Technologically Enhanced Naturally Occurring Radioactive Materials.” The petition alleges TE-NORM is also known as "Naturally Occurring Radioactive Materials” (NORM) and that "Technologically Enhanced Radioactive Materials” (TERM) was also discovered on the property. TENORM was defined in the petition using the definition of the National Research Council of the National Academy of Sciences:
Technologically enhanced naturally occurring radioactive materials are any naturally occurring radioactive materials not subject to regulation under the Atomic Energy Act whose radionuclide concentrations or potential for human exposure have been increased above levels encountered in the natural state by human activities. Petition, ¶ VIII(3).
Despite the various types of radioactive material discussed in the petition, the plaintiff asserted, in other sections of the petition, that the radioactive materials complained of here are comprised solely of TENORM. Petition, ¶ VI(6), Vol. l,p. 6.

. Eagle Pipe failed to state in its petition any dates for either La. DEQ's alleged field interview or remediation order.

. See Petition, ¶ VII(5), Vol. 1, p. 8.

. See Petition, ¶¶ VIII(40-41), Vol. 1, p. 20.

. See Eagle Pipe and Supply, Inc. v. Amerada Hess Corp. et al., 2009-0298 (La.App. 4 Cir. 2/10/10), 47 So.3d 428. The court of appeal also reviewed the trial court's ruling on other matters. Nine defendants answered Eagle Pipe's appeal to preserve their appellate rights to seek review of the district court's denial of their motions to transfer on the ground of forum non conveniens if the appellate court reversed the district court’s ruling on the exceptions of no right of action. Because the court of appeal on rehearing reversed the district court’s ruling on the exception of no right of action, and the dismissal of the suit with prejudice, the court of appeal also reviewed the defendant's answer to the appeal. Finding no error in the district court's denial of the defense motions to transfer, the court of appeal affirmed the district court’s judgment in this regard.

. Intracoastal Tubular Services Inc., f/k/a Intracoastal Truck Lines, Inc. and Walker Trucking, Inc. did not seek writs from this court.

. See Eagle Pipe and Supply, Inc. v. Amerada Hess Corp. et al., 2010-C-2267 c/w 2010-C2272 c/w 2010-C-2275 c/w 2010-C-2279 c/w 2010-C-2289 (La.2/4/11), 56 So.3d 979, 981, 982.

. Amicus briefs were filed in support of the plaintiff by: (1) the Louisiana Association for Justice; (2) Rathborne Properties, Inc.; and (3) Global Marketing Solutions, L.L.C., Larry Wagoner, Jean Wagoner, Russell G. Wagoner, Sr., Angela C. Wagoner, Roy Wagoner, Ivie Wagoner, Barbara R. Mayeux, James E. May-eux, Jr., Timothy J. Mayeux, Renee Mayeux Bordelon, Joey Mayeux Milazzo, Six C Properties, L.L.C., Cross Creek Properties, L.L.C., James Glasgow, Busbice Children’s Trust, through its trustee, Billy A. Busbice, Jr., Billy Busbice, Jr. and Hunter Farms & Timber, L.L.C.

. The objection may be raised by the defendant or noticed by the court on its own motion in either the trial or appellate court. Howard v. Administrators of Tulane Educational Fund, 2007-2224 p. 16-17 (La.7/1/08), 986 So.2d 47, 59; La. C.C.P. arts. 927(B) and 2163.

. See also A.N. Yiannopoulos, Louisiana Civil Law Systems, § 35, p. 53 (1977) and citing cases.

. Citing James L. Dennis, Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent, 54 La. L.Rev. 1, 15 (1993).

. See Yiannopoulos, supra, at § 35, p. 54.

. 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise, Property, at § 3, p. 4 (4th ed.2001).

. Yiannopoulos, at § 4, p. 6.

. Yiannopoulos, at § 2, p. 3.

. Yiannopoulos, at§ 18, p. 35.

. Yiannopoulos, at § 15, p. 29.

. "Thus, 'common things,’ such as the atmospheric air and the open sea, though not susceptible of appropriation, are termed things; and the beds or bottoms of natural navigable water bodies, running water, the territorial sea, and its shores, though necessarily owned by the state in its capacity as a public person, are likewise termed things.” Yiannopoulos, at § 15, p. 29; see also La. C.C. arts. 449 (Common things) and 450 (Public things).

.Yiannopoulos, at § 15, p. 29; see also Lanza v. Lanza, 2004-1314, p. 7 n. 3 (La.3/2/05), 898 So.2d 280, 284 n. 3.

. Commentators have described the concept of ownership as "exclusive, that is to say, it consists in the attribution of a thing to a given person to the exclusion of all others.” Marcel Planiol and George Ripert, Treatise on the Civil Law, Property, Vol. 1, Part 2, no. 2329, p. 378 (12th ed.1939) (translated by the Louisiana State Law Institute with the authority of Librairie Générale de Droit et de Jurisprudence (Paris)).

. In referring to the rights of ownership, "[t]he ancients used solely the nouns usus, fructus, and abusus....” Planiol and Ripert, at No. 2332, p. 380 n.l.

. Usufruct and servitude will be subsequently discussed. An emphyteusis is "a contract by which a landed estate was leased to a tenant, either in perpetuity or for a long term of years, upon the reservation of an annual rent or canon, and upon the condition that the lessee should improve the property, by building, cultivating, or otherwise, and with a right in the lessee to alien the estate at pleasure or pass it to his heirs by descent, and free from any revocation, re-entry, or claim of forfeiture on the part of the grantor, except for non-payment of the rent.” Black’s Law Dictionary, 471 (5th ed. 1979).

. Planiol and Ripert, at No. 2337, p. 384-385.

. The nature of a real right is explained in a treatise on the civil law of property as “rights that impose a general obligation to respect the power that a person has under the law to derive from things the whole or a part of the advantages which their possession entails or as rights that confer on a person a direct and immediate authority over a thing which is operative against the world.” Yiannopoulos, at § 214, p. 411.

. Usufruct is a real right of limited duration on the property of another. La. C.C. art. 535.

. Habitation is the nontransferable real right of a natural person to dwell in the house of another. La. C.C. art. 630.

. The personal servitude of right of use confers in favor of a person a specified use of an estate less than full enjoyment. La. C.C. art. 639.

. Natural predial servitudes arise from the natural situation of estates. Legal predial servitudes are imposed by law. Voluntary or conventional predial servitudes are established by juridical act, prescription, or destination of the owner. La. C.C. art. 654.

. La. R.S. 30:16 provides, in pertinent part: "the basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease. This enumeration does not exclude the creation of other mineral rights by a landowner. Mineral rights are real rights....”

. Building restrictions are charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements. La. C.C. art. 775. The classification of building restrictions as sui generis real rights is subject to the requirement, imposed by the Civil Code, that there be a general plan that is feasible and capable of being preserved. Id., Revision Comments — 1977, (c).

. There are other real rights which are not relevant to this opinion and are not discussed.

. The object may be either a movable or an immovable. Under Louisiana law, tracts of land, with their component parts, are immov-ables. La. C.C. art. 462. Corporeal movables are things, whether animate or inanimate, that normally move or can be moved from one place to another. La. C.C. art. 471.

. "The right of preference is the prerogative that the holder of a real right has to exclude from the enjoyment of a thing persons having only a personal right or a real right of inferior rank.” Yiannopoulos, at§ 215, p. 413.

. "It is the prerogative of the holder of a real right to exercise his right over the thing wherever it may be found. The owner of a thing may thus reclaim it in the hands of any possessor.” Yiannopoulos, at § 215, p. 412.

. Yiannopoulos, at § 223, p. 428.

. Planiol and Ripert, at No. 2332, p. 380.

. This codal article clarifies "... that ownership is comprised in the warranty-” La. C.C. art. 2475, Revision Comments — 1993(a).

. Art. 2315 is found in Book III (Obligations Law), Title V (entitled "Obligations Arising Without Agreement”), Chapter 3 (entitled “Of Offenses and Quasi Offenses”).

. Former La. C.C. Art. 2012 (1870) described the methods of creating real obligations, but this article was not included in the 1984 revision of the Civil Code, having been deemed unnecessary. See La. C.C. art. 1764, Revision Comments — 1984, (g).
Former Art. 2012 provided that real obligations could be created in three ways: (1) by the alienation of immovable property, subject to a real condition, either expressed or implied by law; (2) by alienating to one person the immovable property, and to another, some real right to be exercised upon it; and (3) by the creation of a right of mortgage upon the immovable property. Former Art. 2012 also stated; "All these contracts give rise to obligations purely real on the part of those who acquire the land, under whatever species of title they possess it; they are not personally liable, but the real property is, and, by abandoning it to the obligee, they relieve themselves from all responsibility. A sale subject to a rent charge, or to a right of redemption as consideration of the sale, are examples of the first kind of obligations; ser-vitudes, the right of use and habitation and usufruct, are examples of the second; and the several kinds of mortgages, and the creation of a rent charge, of the third.”
After the 1984 revision, the effects of real obligations were continued in Art. 1764, as discussed in the body of the opinion.

. Yiannopoulos, at § 212, p. 407.

. Yiannopoulos, at §§ 201 and 203, pp. 384, 386.

. See also Yiannopoulos, at § 214, p. 411.

. Yiannopoulos, at § 201, p. 384. Although recordation, for instance of a lease, enables the lessee to assert his right against third parties, the nature of the right of the lessee is not altered. The lessee has a personal right against the owner to let him enjoy the thing. The lessee’s remedy for a breach of obligation is an action for damages or termination of the lease. Yiannopoulos, at § 226, p. 441.

. La. C.C. art. 1764, Revision Comments— 1984, (c) provides:
A real obligation passes to a subsequent acquirer of the thing to which it is attached without need of a stipulation to that effect. Thus, when an estate burdened with a servitude is transferred, the real obligation that is correlative of the right of servitude is also transferred. See C.C. Art. 650(2) (Rev. 1977). It is otherwise with respect to personal obligations.

.La. C.C. art. 1764, Revision Comments— 1984, (d) and (f) provide, in pertinent part:
(d) A particular successor, that is, one who acquires a thing by particular title, is not bound by the personal obligations of his author with respect to the thing, unless he has assumed these obligations by delegation. Conversely, a particular successor does not acquire, without stipulation to that effect, any personal rights that his author has with respect to the thing. For example, if the owner of an immovable who has made a contract for its repair sells the immovable, the purchaser is not bound to perform the obligation of the owner under the repair contract unless he assumes that obligation. Conversely, the purchaser does *263 not acquire any right under the repair contract unless such a right is assigned to him....
[[Image here]]
(f) Louisiana courts have held that the indemnity due to the owner of an immovable for the expropriation of a part of that immovable, and damages due to the owner of a thing for its partial destruction or for an interference with the owner’s rights, belong to the person who was owner at the time of the expropriation, destruction, or interference. These are personal rights that are not transferred to a successor by particular title without a stipulation to that effect. Rogers v. Louisiana Power and Light Co., 391 So.2d 30 (La.App. 3rd Cir.1980); Yiannopoulos, Predial Servitudes § 147 (1983).

. Matthews, 45 La.Ann. at 466, 12 So. at 518.

. The following cases belong in a long line of cases dealing with the jurisprudentially-recog-nized theory involving the creation of a servitude by "unopposed use and occupancy” by a corporation with the power of expropriation. This came to be known as the St. Julien doctrine, after one of the first of these cases, St. Julien v. Morgan Louisiana & Texas Railroad Co., 35 La.Ann. 924 (1883). In that case, the court, relying on common law authorities, held that public policy required "that in such case the owner shall not be permitted to reclaim his property free from the servitude he has permitted to be imposed upon it, but shall be restricted to his right of compensation.” St. Julien, 35 La.Ann. at 926. The St. Julien doctrine was ultimately overruled in Lake, Inc. v. Louisiana Power & Light Co., 330 So.2d 914 (La.1976), and the court returned to the Civil Code provisions for the establishment of servitudes for the benefit of the "clarity and predictability of the law.” Lake, Inc., 330 So.2d at 918. The cases cited herein with a connection to the St. Jidien doctrine are not cited for the later-overruled reasoning regarding the creation of a servitude, but for the unaffected rule that the personal right for compensation or damages remains with the person who was the owner of the property at the time the land was taken or damaged.

. Former Articles 2719 and 2720 obliged a lessee to return the premises to the lessor in the same condition in which they were received, excepting normal usage, unless the lease contract provided otherwise. Former La. C.C. art. 2719 provided: “If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents.” Former La. C.C. art. 2720 provided: "If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.”

. The facts in Prados contain a complicating factor not found in our present case. Under the lease in Prados, the lessee was authorized by the lessor to build on the land leased. Ordinarily, buildings and other constructions permanently attached to the ground are component parts of the land under Louisiana law, when they belong to the owner of the ground. La. C.C. arts. 463 and 465. In addition, a building may be a separate immovable when it belongs to a person other than the owner of the ground. La. C.C. art. 464. In the absence of any agreement to the contrary, the building constructed by the lessee would have belonged to the lessor/owner of the ground after the expiration of the lease, but the lessee would have had an action to recover reimbursement. The lease provision which authorized the lessee to build also gave the lessee the right to remove the building, or not, at the end of the lease term. One of the underlying questions at issue in Prados was whether this lease provision overrode the co-dal requirements that the lessee return the land to its original condition.

. See also Leonard v. Lavigne, 245 La. 1004, 1008, 162 So.2d 341, 343 (1964) where the court held that a covenant in a recorded lease prohibiting landlords from using adjoining property for business purposes that would compete with those engaged in by their tenant expressly bound the heirs and assigns of the landlords, but was not a real obligation on the land itself. “The stipulation in the contract of lease does not create a real obligation upon the land itself, but is clearly an obligation the lessors placed upon themselves.” In Calhoun v. Gulf Refining Co., 235 La. 494, 507, 104 So.2d 547, 551 (1958), the court held "[t]he lessee under a lease contract does not obtain a real right in the sense of absolute dominion, and a lease is not one of those real obligations which attach as a burden to the land, as does a servitude; in other words, a lease is not a Jus in re, but a Jus in rem, a right upon the thing.”

. Former La. C.C. art. 2461 (1870) provided "[t]he sale of a thing includes that of its accessories, and of whatever has been destined for its constant use, unless there be a *271 reservation to the contrary.” Former La. C.C. art. 2490 (1870) provided ”[t]he obligation of delivering the thing includes the accessories and dependencies, without which it would be of no value or service, and likewise everything that has been designed to its perpetual use.”
The "inclusion of accessories” to a sale is now found in La. C.C. art. 2461: "The sale of a thing includes all accessories intended for its use in accordance with the law of property.” According to the revision comments, the new codal article changes the law in part, "since according to Articles 2461 and 2490 of the Louisiana Civil Code of 1870 the sale of a thing also includes its accessories, while under property law the solution depends on whether the thing is movable or immovable.” La. C.C. art. 2461, Revision Comment — 1993.
La. C.C. art. 469 now provides: "The transfer or encumbrance of an immovable includes its component parts.” The revision comments to that article explains: "Under the regime of the Louisiana Civil Code of 1870, the transfer of an immovable included, specifically, its accessories that were classified as immovables by destination. In this revision, the transfer of an immovable includes its accessories though classified as movables. Article 508, infra, [which discusses things principal and accessory] defines the accessories of a movable. The same definition may be applied by analogy to define the accessories of an immovable.” La. C.C. art. 469, Revision Comments — 1978(g).

. According to former La. C.C. art. 2009 (1870): "All rights, acquired by a heritable obligation, may be assigned (and transferred); this assignment may be made, expressly by contract granting such right, or impliedly by the conveyance of the property to which they are attached.” (Emphasis added).
The heritable obligation is now defined in La. C.C. art. 1765, which reproduces the substance of former La. C.C. arts. 1997, 1999 and 2009 (1870). See La. C.C. art. 1765, Revision Comments — 1984. La. C.C. art. 1765, regarding heritable obligations, provides: "An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor. Every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract. A heritable obligation is also transferable between living persons.”

. Prados, 329 So.2d at 750 n. 1, citing Marcel Planiol and Georges Ripert, Traite Pra-tique de Droit Civil Francais, Contrats Civils, Vol. 10, Sec. 87, p. 89-90 (2nd ed. 1956) ("Des droits personnels appartenant au vend-eur ne peuvent jamais étre considérés comme des accessoires de Timmeuble vendu.”).

. The authority for the court’s statement was, in part, Aubry & Rau, Droit Civil Fran-cais, An English Translation by the Louisiana State Law Institute, Vol. 2, § 176, p. 76 (7th ed. 1961). Found on the page indicated in Section 176 is No. 69 entitled “Rights acces-sary to the transferred property.” In Aubry & Rau, the example under discussion concerned property sold during an existing lease, which was not at issue in Prados and is not at issue here.
The other authority was the code article in redhibition providing that a seller owes no warranty for defects that were known, or should have been known, at the time of the sale. La. C.C. art. 2521.
Even if the comment was directed at the general rule expressed in the subsequent purchaser rule, the statement merely reiterates the observation made in earlier cases that obvious or apparent damage to property is generally taken into account in setting the purchase price.

. See Aizpurua v. Crane Pool Co., Inc., 449 So.2d 471 (La.1984), superceded by statute, as recognized in St. Jude Medical Office Bldg. Ltd. Partnership v. City Glass and Mirror, Inc., 608 So.2d 236 (La.1993).

. Aizpurua was based on former La. C.C. art. 2011 (1870), which held:
Not only the obligation, but the right resulting from a contract relative to immovable property, passes with the property. Thus, the right of servitude in favor of immovable property, passes with it, and thus also the heir or other acquirer will have the right to enforce a contract made for the improvement of the property by the person from whom he acquired it.
See St. Jude, 619 So.2d at 531 (emphasis in original).
This former codal provision was subsequently repealed and replaced with La. C.C. art. 1764, which describes the effects of real obligations. See Art. 1764, Revision Comments — 1984(a). Art. 1764, Revision Comment (d) explains former Art. 2011 was "suppressed because its provisions are conceptually inconsistent with other provisions of Louisiana law.” La. C.C. art. 1764, Revision Comments — 1984(d) explains further: "A particular successor, that is, one who acquires a thing by particular title, is not bound by the personal obligations of his author with respect to the thing, unless he has assumed these obligations by delegation. Conversely, a particular successor does not acquire, without stipulation to that effect, any personal rights that his author has with respect to the thing. For example, if the owner of an immovable who has made a contract for its repair sells the immovable, the purchaser is not bound to perform the obligation of the owner under the repair contract unless he assumes that obligation. Conversely, the purchaser does not acquire any right under the repair contract unless such a right is assigned to him.”
According to St. Jude, the holding in Aizpu-rua was "in derogation of the general rule of non-recovery.” St. Jude, 619 So.2d at 531.

.In Aizpurua, the former property owners were sued in redhibition; however, the claim was dismissed as having been prescribed. Id., 449 So.2d at 471-472.

. See Hopewell, Inc. v. Mobil Oil Co., 35,774, p. 1-2 (La.App. 2 Cir. 11/1/00), 770 So.2d 874, 875-876.

. Hopewell, 33,774, p. 5, 770 So.2d at 878.

. Hopewell, 2000-3280, p. 1, 784 So.2d at 653.

. La. C.C. art. 2531 provides specific rules when the seller did not know of the defect:
Art. 2531. Liability of seller who knew not of the defect
A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.
A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. Any contractual provision that attempts to limit, *276 diminish or prevent such recovery by a seller against the manufacturer shall have no effect.

. See ex. La. C.C. art. 2534, which provides for prescription for the right of redhibition, and La. C.C. art. 3493, which provides for prescription for damage to immovable property.

. Marin is such a case, where this court found even if the plaintiff had a right to bring an action, the action would be prescribed due to the passage of time.

. See La. R.S. 30:2026 (Citizen suits), La. R.S. 30:6(F) (interested persons have the right to have the commissioner of conservation call a hearing for the purpose of taking action); La. R.S. 30:16 (suit by interested party upon commissioner of conservation's failure to sue); see also generally La. R.S. 30:2001 at seq. (Louisiana Environmental Quality Act).

.In the absence of legislative action in this regard, we note our rejection of the analysis of the concurring opinion on rehearing. We find nothing in the federal or state governments' actions in creating a mechanism for remediation of property which would necessarily result in a right of action by the current landowner to claim damages.

. Eagle Pipe, 2009-0298, p.1-9, 47 So.3d at 431-435.

. Id., 2009-0298, p. 9, 47 So.3d at 435.

. Cases interpreting whether an “occurrence” occurs during a policy period of insurance coverage have considered both the exposure theory and the manifestation theory.
Under the exposure theory, damage would be considered to have occurred when the act which resulted in the damage took place, not when the damage was discovered. Thus, where damage develops over a period of time from continuous or repeated exposure to injurious conditions, courts have determined that the occurrence took place either at the inception of the exposure period or continuously during the entire course of exposure, as in asbestos cases. Even where the damage or injury was not manifested until after an insurer’s policy period, if the insurer’s policy period fell either at the inception or during the course of exposure, the insurer would be liable.
Under the manifestation theory, property damage would be considered to have occurred when it became manifest, regardless of when the act from which it resulted occurred. Oxner v. Montgomery, 34,727, p. 11 (La.App. 2 Cir. 8/1/01), 794 So.2d 86, 93, writ denied, 2001-2489 (La.12/7/01), 803 So.2d 36, citing Korossy v. Sunrise Homes, Inc., 94-473 (La.App. 5 Cir. 3/15/95), 653 So.2d 1215, writs denied, 1995-1536, 1995— 1522 (La.9/29/95), 660 So.2d 878.
In this case, the court of appeal relied on Ricks v. Kentwood Oil Co., Inc., 2009-0677 p. 11-12 (La.App. 1 Cir. 2/23/10), 38 So.3d 363, 371-372, appeal denied, 2010-1733 (La. 10/15/10), 45 So.3d 1112 (trigger for emotional/mental distress damages under insurance contract was after damage became known; interpretation of "occurrence”); Rando v. Top Notch Properties, L.L.C., 2003-1800 p. 4-18 (La.App. 4 Cir. 6/2/04), 879 So.2d 821, 825-834 (defects in construction that result in damage subsequent to completion are "occurrences” under insurance contract when they manifest); Oxner, 34,727 p. 11-12, 794 So.2d at 93 (property damage considered to have occurred when it became manifest, regardless of when the act from which it resulted occurred; insurance coverage excluded by other insurance provisions); and James Pest Control, Inc. v. Scottsdale Ins. Co., 99-1316 p. 12 (La.App. 5 Cir. 6/27/00), 765 So.2d 485, 491, writ denied, 2000-2285 (La. 10/27/00), 772 So.2d 657 (manifestation of termite damage triggered insurance coverage) as authority for its conclusion that injury is deemed to occur when the damage "manifests.” See Eagle Pipe, 2009-0298 p. 8-9, 47 So.3d at 441. These theories of insurance contract interpretation, deriving from personal injury concepts, are not applicable here.

. Eagle Pipe, 2009-0298, p. 9, 47 So.3d at 442 (emphasis added).

. Opposition Brief of the Plaintiff-Respondent, p. 15.

. La. C.C. art. 1764, Revision Comments-1984(f) provides, in pertinent part:
[[Image here]]
When the owner of the servient estate interferes with the servitude, he violates a real obligation, and may cause damage to the owner of the dominant estate. If the owner of the dominant estate sells it, the claim for damages still belongs to him. It is a personal right that does not pass with the immovable unless assigned. Conversely, when the owner of the dominant estate abuses the servient estate, an indemnity may be due to the owner of the servient estate. If the servient estate is sold, the indemnity belongs to the vendor. It is a personal right that does not pass with the immovable unless assigned. See Dunlap v. Red River Waterway Commission, 405 So.2d 655 (La.App. 3rd Cir. 1981); Dickson v. Arkansas Louisiana Gas Co., 193 So. 246 (La.App. 2nd Cir. 1939); Yiannopoulos, Predial Servitudes § 157 (1983). In contrast, the obligation to demolish works and to restore the premises to their previous condition is a real obligation, following the immovable into the hands of any acquirer. Id.; 3 Planiol et Ripert, Traité pratique de droit civil franqais 966 (2d ed. Picard 1951). (Emphasis added).

. "Act of Sale and Mortgage,” Exhibit A to the Petition, Vol. 1, p. 23.

. We do not find the provisions of La. R.S. 30:29(H) supply a separate right of action in the absence of an express contractual provision:
H. This Section shall not preclude an owner of land from pursuing a judicial remedy or receiving a judicial award for private claims suffered as a result of environmental damage, except as otherwise provided in this Section. Nor shall it preclude a judgment ordering damages for or implementation of additional remediation in excess of the requirements of the plan adopted by the court pursuant to this Section as may be required in accordance with the terms of an express contractual provision. Any award granted in connection with the judgment for additional remediation is not required to be paid into the registry of the court. This Section shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease. Moreover, because not factually relevant,
we express no opinion as to the applicability of our holding to fact situations involving mineral leases or obligations arising out of the Mineral Code.

. See La. C.C. art. 517, Revision Comments-1979(b); former La. C.C. art. 2015 (1870) provided in pertinent part: “no one can transfer a greater right than he himself has.” The disposition of this former Civil Code article is explained in La. C.C. art. 1764, Revision Comments-1984(g): “Civil Code Article 2015 (1870) has also been eliminated without intending any change in the law. That no one may transfer a greater right than he has is a conclusion that results from general principles.” (Emphasis added)

. See Petition, ¶¶ VIII(17-19); Vol. 1, p. 13-14.

. As noted in Joseph, BLACK’S LAW DICTIONARY 1724 (7th ed. 1999) defines a stipulation pour autrui as a French civil law term meaning a stipulation “for other persons.” Joseph, 2005-2364, p. 7 n. 5, 939 So.2d at 1211 n. 5.

. See La. C.C. arts. 1978-1982.

. Although the plaintiff would ordinarily bear the burden of proving both that such contracts exist and that they contain the described language, this issue arises in the context of an exception of no right of action. "For the purposes of the exception all well pleaded facts in the petition must be taken as true.” Harwood Oil & Min. Co., 240 La. at 649, 124 So.2d at 766-767.

.In Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 569 (La.1990), we stated: "[t]he mere fact that a duty exists does not mean that it extends to everyone against every risk all of the time.”