# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-69


CV LAND, LLC

VERSUS

MILLERS LAKE, LLC


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 79,250-A
HONORABLE MARCUS L. FONTENOT, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


**WILBUR L. STILES**
**JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Candyce G. Perret, Jonathan W. Perry, and Wilbur L. Stiles, Judges.


**REVERSED AND REMANDED.**

**Alan K. Breaud**
**Timothy W. Basden**
**Breaud & Meyers**
**Post Office Box 51365**
**Lafayette, LA 70505**
**(337) 266-2200**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **CV Land, LLC**

**Jeffrey K. Coreil**
**Katelyn E. Bayhi**
**Neuner Pate**
**1001 West Pinhook Road, Suite 200**
**Lafayette, LA 70503**
**(337) 237-7000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Miller's Lake, LLC**

**STILES, Judge.**

Plaintiff CV Land, LLC (CV Land) sought damages and an injunction associated with its claim for access to the natural flow of running water from adjacent property owner, Defendant Miller's Lake, LLC (Miller's Lake). The trial court sustained Miller's Lake's exception of no right of action and dismissed CV Land's claims. CV Land appeals. For the following reasons, we reverse and remand.

### FACTUAL AND PROCEDURAL HISTORY

This matter, which questions CV Land's right to advance its claims pertaining to riparian rights, stems from the creation of Miller's Lake (the Lake), an approximately 3,000-acre[1] reservoir in Evangeline Parish. The record establishes that J.B. "Gus" Miller (Mr. Miller) was the former owner of the larger property at issue in this case. Although the record offers no detail as to Mr. Miller's initial acquisition of the property, it demonstrates that, as early as the 1920s, he sought to capture water from naturally occurring Bayou Nezpique, as well as other tributaries, to flood his property for irrigation purposes.

Mr. Miller did so with the development of a levee system on his own property but ultimately extended that project onto adjoining property owned by John LaHaye. A 1933 contract filed into the Evangeline Parish land records reflects that the two men "formed a partnership between them in the operation, mainten[an]ce, and profit of the Lake commonly known as the 'Gus Miller Lake,' in the Parish of Evangeline[.]" The agreement reflects the partners' cost, maintenance, and profit sharing arrangements. The agreement further provides:

> That the water of said lake being used commercially as a Gravity
> Irrigation project it is agreed and understood that the Contractors hereto

---

[1] The petition and witness testimony suggest that the Lake covers between 3,040 to 3,200 acres.

and their assigns, at their option shall enjoy first preference on the water of said lake for Irrigating Rice lands respectively belonging to either.

The resulting levee system was improved over the years and, at the time of the underlying proceedings, features a dam, several spillways, and discharge pipes. The Lake is charged by Bayou Nezpique, various smaller tributaries, rainwater, and by waters supplied by watershed structures constructed by the Parish.

Following Mr. Miller's death in 1944, his heirs were placed into possession of the totality of the subject property that same year. The heirs, as co-owners, subsequently partitioned the acreage into two tracts and transferred each to family-held corporations, the defendant, Miller's Lake, LLC, and Leslie Ardoin, Inc. The Lake, along with its dam and levee system, is contained within the Miller's Lake tract.

In 2016, CV Land purchased its 1,014-acre tract from Leslie Ardoin, Inc. The CV Land tract is adjacent to the Lake's western levee and spillway. While CV Land sought to negotiate water access rights at the time of the purchase, Leslie Ardoin, Inc. refused the term.[2] The resulting sale recognized that "[t]he parties hereto jointly acknowledge that Miller's Lake, LLC has a 100 foot 'working servitude' along the levee of Miller's Lake in the event that the levee should need repair."

In 2021, CV Land filed the Petition for Enforcement of Natural Servitude, Injunction, and Damages instituting this matter against Miller's Lake, the operator of the Lake. By its petition, CV Land explains that, prior to the Lake's construction, the surrounding land drained naturally into Bayou Nezpique. CV Land alleges, however, that the flow of water is now diverted by the Lake's dam and that "little, if

---

[2] Miller's Lake asserts that, in doing so, Leslie Ardoin, Inc., recognized Miller's Lake's right of reservoir.

any water flows in Bayou Nezpique where it crosses the riparian property owned by CV Land." CV Land asserts that it demanded that Miller's Lake restore the natural flow of water to Bayou Nezpique so that CV Land could use the water for agricultural irrigation. Miller's Lake rejected the demand and sought payment before returning the flow of water.

CV Land maintains that such a demand for payment is contrary to the public nature of running water. Further, as the owner of an adjacent riparian estate, CV Land enjoys the right to use naturally flowing water of Bayou Nezpique for irrigation purposes. CV Land acknowledges that Miller's Lake has the right to make use of the naturally flowing waters of Bayou Nezpique as it runs over its own land pursuant to La.Civ.Code art. 658. It maintains, however, that Miller's Lake may not capture that flowing water and sell it to downstream riparian landowners. Louisiana Revised Statutes 38:218 instead requires Miller's Lake to "return the water to its natural course before it leaves [its] estate without any undue retardation of the flow of water outside of [its] enclosure thereby injuring an adjacent estate." CV Land argues that, since Miller's Lake has failed to do so, its operation of the Lake's dam violates "the natural servitude which exists in favor of CV Land, a downstream riparian estate which borders Bayou Nezpique."

CV Land maintains that Miller's Lake's "unlawful capture and diversion of the natural flow of water in Bayou Nezpique" has damaged "CV Land by reducing the lease value of the land and unlawfully limiting the kinds of agricultural and commercial uses to which the land would be suitable if the natural flow of water was not impeded." CV Land seeks a judgment that Miller's Lake has breached and violated CV Land's servitude rights and caused damage to CV Land by its actions; a permanent injunction, enjoining Miller's Lake from impeding the natural flow of

water in Bayou Nezpique; and an order directing Miller's Lake to immediately restore the natural flow of water in Bayou Nezpique, without charge or cost to CV Land; and damages "reasonable under the premises, including damages for lost revenues due to reduced lease value, lost opportunity to develop its land, reduction in value due to the unlawful diversion of the natural flow of Bayou Nezpique, and all other damages under the premises, to be proven at Trial."

Miller's Lake responded to the petition with an exception of no right of action, alleging that 1) Mr. Miller, as the original owner of the CV Land tract, voluntarily alienated and/or renounced the property's downstream riparian rights in the early 1900's; 2) Leslie Ardoin, Inc. did not assign CV Land any right of action against Mr. Miller's successors in the 2016 Act of Sale as required by the subsequent purchaser doctrine as expressed in *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2267 (La. 10/25/11), 79 So.3d 246; 3) CV Land and its predecessor in title, Leslie Ardoin, Inc., renounced and/or waived any claims against Miller's Lake, Inc. by its acknowledgement and agreement to a "working servitude" for the levee system in favor of Miller's Lake; and 4) acquisitive prescription.

Following a hearing, at which the parties presented testimony surrounding the history of the subject property as well as documentary evidence, the trial court maintained the exception of no right of action, reasoning that:

> [T]he issue before this court is whether CV Land has a right to bring the action. I believe everybody agrees that CV Land is currently the land owner of the 1,000-plus acres to the south, if you will … of Miller's Lake. I think the records clear that approximately 90-plus years ago, J.B. Gus Miller owned both the CV tract and the Miller Lake, LLC tract. At the time he owned it, J.B. Gus Miller constructed a levee system to hold water on his property which is now the lake. Uh, at the time of the construction of the dam and the levee system, the court finds that J.B. Gus Miller voluntarily alienated and renounced any riparian rights associated with his property. Including the property currently owned by CV Land. Because of Mr. Miller's renouncement CV Land

as the current landowner, has no right to enforce, uh, or no right of action in the, in this matter. Also, with respect to the accrual of acquisitive prescription, I think the record is clear that the levee was construct[ed] … approximately 90 plus years ago and then re-don[e], if you will made bigger, in the 1950s. Um, which is 30-plus years ago, so I think also any … riparian rights were lost by acquisitive prescription. Further, even if CV Land had the rights to enforce, … what it's attempting to enforce in this litigation, … I mean not CV Land. If the property owner of the property, which I believe is Leslie Ardoin, Inc., had the rights. Those rights were not assigned to CV Land in the Act of Cash Sale, which had been introduced into the record. Uh, because the Act of Sale is silent, I think the Eagle Pipe case does apply in this matter. For the foregoing reasons, … the Peremptory Exception of No Right of Action is sustained.

CV Land appeals, questioning in a single assignment of error whether "[t]he trial court erred in sustaining the Peremptory Exception of No Right of Action and dismissing the Petition filed by CV Land, LLC."

## DISCUSSION

*Exception of No Right of Action*

Louisiana Code of Civil Procedure Article 681 provides that "[e]xcept as otherwise provided by law, an action can be brought only by a person having a real and actual interest which he asserts." Set forth by La.Code Civ.P. art. 927(A)(6), the peremptory exception of no right of action is the vehicle by which a defendant challenges whether a plaintiff has a real or actual interest in an action. In the event the exception is filed prior to trial of the case, "evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition." La.Code Civ.P. art. 931.

In the event the parties introduce evidence in support of or in opposition to the exception, an appellate court considers the trial court's findings of fact pursuant to the manifest error-clearly wrong standard of review. *State ex rel. Caldwell v. Molina Healthcare, Inc.*, 18-1768 (La. 5/8/19), 283 So.3d 472. Otherwise, an

5

exception of no right of action involves a question of law; appellate review is thus de novo. *Id.* Thus, like the trial court, an appellate court considers whether the particular plaintiff has a right to bring the suit and is a member of the class of persons having a legal interest in the subject matter of the litigation, assuming that the petition advances a valid cause of action for some person. *Id.* "If doubt exists about the appropriateness of an objection of no right of action, it is to be resolved in favor of the plaintiff." *Id.* at 477.

*Running Waters and Bed of Bayou Nezpique*

As consideration of the exception of no right of action begins with an examination of the pleadings, we first point out that CV Land's petition advances a cause of action focusing on the running waters of Bayou Nezpique. *See Howard v. Adm'rs of Tulane Educ. Fund*, 07-2224 (La. 7/1/08), 986 So.2d 47. CV Land squarely focuses on the nature of those waters as a "public thing."

Reference to the Louisiana Civil Code confirms that CV Land's characterization is accurate. Namely, "running waters" are specifically identified as a "public thing" and thus, property of the state as follows:

> Public things are owned by the state or its political subdivisions in their capacity as public persons.
>
> Public things that belong to the state are such as *running waters*, the waters and bottoms of natural navigable water bodies,[3] the territorial sea, and the seashore.

---

[3] The navigability of Bayou Nezpique or its connectivity to the Gulf of Mexico are neither pleaded nor established in the record at this juncture in the litigation. *See Ricko Constr., Inc. v. Dubois*, 10-1062 (La.App. 3 Cir. 2/9/11), 57 So.3d 564 (providing that navigability is not presumed). It is, however, instructive to note that the "public" character of beds and bottoms of pertinent navigable waters is reflected throughout the Louisiana Constitution, the Louisiana Civil Code, and the Louisiana Revised Statutes.

Louisiana Constitution Article 9, § 3 provides that:

*The legislature shall neither alienate nor authorize the alienation of the bed of a navigable water body*, except for purposes of reclamation by the riparian owner to recover land lost through erosion. This Section shall not prevent the leasing of

La.Civ.Code art. 450 (emphasis added). Further, the legislature has specifically recognized that the "waters" and "beds" of "all bayous" are state property:

> *The waters of and in all bayous*, rivers, streams, lagoons, lakes and bays, *and the beds thereof*, not under the direct ownership of any person on August 12, 1910, *are declared to be the property of the state*. There shall never be any charge assessed against any person for the use

state lands or water bottoms for mineral or other purposes. Except as provided in this section, *the bed of a navigable water body may be reclaimed only for public use.*

(Emphasis added.)

Further, titled "Ownership of wild birds, quadrupeds, fish, acquatic life, water bottoms, oysters, and shellfish," La.R.S. 56:3 includes "beds and bottoms of . . . bayous" in the list of state-owned properties as follows:

> A.      The ownership and title to all wild birds, and wild quadrupeds, fish, other acquatic life, *the beds and bottoms of* rivers, streams, *bayous*, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico within the territory or jurisdiction of the state, including all oysters and other shellfish and parts thereof grown thereon, either naturally or cultivated, and all oysters in the shells after they are caught or taken therefrom, *are and remain the property of the state*, and shall be under the exclusive control of the Wildlife and Fisheries Commission except as provided in R.S. 56:4.

> B.      Wild birds, quadrupeds, fish, other aquatic life, and the beds and bottoms of rivers, streams, bayous, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico, within the territorial jurisdiction of the state, including all oysters and other shellfish and parts thereof grown thereon, either naturally or cultivated, and all oysters in the shells after they are caught or taken therefrom, shall not be taken, sold, or had in possession except as otherwise permitted in this Title; and the title of the state to all such wild birds, quadrupeds, fish, and other aquatic life, even though taken in accordance with the provisions of this Title, and the beds and bottoms of rivers, streams, bayous, lagoons, lakes, bays, sounds, inlets always remains in the state for the purpose of regulating and controlling the use and disposition therefor.

*See also* La.R.S. 56:4 (providing for the corresponding "authority of the Department of Natural Resources to lease or otherwise administer the beds and bottoms of navigable rivers, streams, bayous, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico within the territory or jurisdiction of the state[.]").

Finally, in contrast to the "public" nature of running water and the "waters and bottoms of natural navigable water bodies" as identified in La.Civ.Code art. 450, Article 456 provides that "[t]he banks of navigable rivers or streams are private things that are subject to public use. The bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water." As such, the state owns the land of the water bottom from low water mark to low water mark.

of the waters of the state for municipal, industrial, agricultural or domestic purposes.

> While acknowledging the absolute supremacy of the United States of America over the navigation on the navigable waters within the borders of the state, it is hereby declared that the ownership of the water itself and the beds thereof in the said navigable waters is vested in the state and that the state has the right to enter into possession of these waters when not interfering with the control of navigation exercised thereon by the United States of America. This Section shall not affect the acquisition of property by alluvion or accretion.

La.R.S. 9:1101 (emphasis added).

As public things, the running waters and the bed of Bayou Nezpique "are subject to public use in accordance with applicable laws and regulations." La.Civ.Code art. 452. While susceptible of ownership, public things are not susceptible of *private* ownership. *See* A.N. Yiannopoulos & Ronald J. Scalise, Jr., 2 La. Civ. L. Treatise: Property § 3.5 (5th ed. 2022). *See also City of New Orleans v. Carrollton Land Co.*, 131 La. 1092, 60 So. 695 (1913). Instead, public things "are owned by the state or its political subdivisions; but this ownership is of a public law nature for the benefit of all persons, citizens or noncitizens." Yiannopoulos & Scalise, Property § 3.5 (footnote omitted).

Louisiana Civil Code Article 458 further restricts the use of public things, providing:

> Works built without lawful permit on public things, including the sea, the seashore, and the bottom of natural navigable waters, or on the banks of navigable rivers, that obstruct the public use may be removed at the expense of the persons who built or own them at the instance of public authorities, or of any person residing in the state.
>
> The owner of the works may not prevent their removal alleging prescription or possession.

Article 458 broadly provides "any person residing in the state" with a right of action to seek the removal of works built without lawful permit on public things and, by its

8

final statement, corresponds to the constitutional precept that "[l]ands and mineral interests of the state … *shall not be lost by prescription*[.]" La.Const. art. 9, § 4. *See also* La.Const. art. 12, § 13 ("Prescription shall not run against the state in any civil matter, unless otherwise provided in this constitution or expressly by law.").

Each of these concepts are in keeping with La.Const. art. 9, § 1, which provides:

> The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

*Right of Action*

Nonetheless, Miller's Lake maintains that CV Land has no right of action to bring its suit for claims related to its purported riparian rights. It contends that CV Land's ancestor in title, Mr. Miller, voluntarily alienated and/or renounced any downstream riparian rights associated with the property. Miller's Lake maintains that any remaining riparian rights existing thereafter were lost by the operation of the Lake's levee system for more than eighty years.

Miller's Lake's argument draws from the concept that, in addition to the right of public use, an owner of an estate bordering on running water *also* has a right to use running water for their own needs. This corresponding right is seen in codal provisions surrounding natural servitudes, those arising from the natural situation of estates. *See* La.Civ.Code art. 654.

The Louisiana Civil Code describes the relationship between estates and the flow of water as follows:

**Art. 655.     Natural drainage**

An estate situated below is the servient estate and is bound to receive the surface waters that flow naturally from a dominant estate situated above unless an act of man has created the flow.

**Art. 656.     Obligations of the owners**

The owner of the servient estate situated below may not do anything to prevent the flow of the water. The owner of the dominant estate situated above may not do anything to render the servitude more burdensome.

**Article 657.Estate bordering on running water**

The owner of an estate bordering on running water may use it as it runs for the purpose of watering his estate or for other purposes.

**Art. 658.     Estate through which water runs**

The owner of an estate through which water runs, whether it originates there or passes from lands above, may make use of it while it runs over his lands. He cannot stop it or give it another direction and is bound to return it to its ordinary channel where it leaves his estate.

As predial servitudes, natural servitudes follow the land. *See* La.Civ.Code art. 650.[4] Central to Miller's Lake's argument, La.Civ.Code art. 729 provides that "[l]egal and natural servitudes may be altered by agreement of the parties if the public interest is not affected adversely." Miller's Lake focuses on the first clause of Article 729, suggesting that natural servitudes associated with CV Land's riparian rights were altered by agreement, destination of the owner, or prescription. However, it is the latter clause of La.Civ.Code art. 729—that invoking the public interest—

---

[4] Titled "Inseparability of servitude[,]" Article 650 provides:

A.     A predial servitude is inseparable from the dominant estate and passes with it. The right of using the servitude cannot be alienated, leased, or encumbered separately from the dominant estate.

B.     The predial servitude continues as a charge on the servient estate when ownership changes.

that ultimately undermines Miller's Lake's argument and requires a reversal of the trial court's ruling.

By its petition, CV Land advances a claim for Miller Lake's obstruction of the flow of water by the construction and maintenance of a privately owned reservoir and accompanying water control structures. CV Land invokes the public nature of the waters of Bayou Nezpique, citing La.Civ.Code arts. 450 and 452. CV Land further references this court's jurisprudence indicating that "[t]he obligations arising from water being a public thing requires the owner through whose estate running waters pass to allow water to leave his estate through its natural channel and not to unduly diminish its flow . . . ." *Buckskin Hunting Club v. Bayard*, 03-1428, p. 11 (La. 3/3/04), 868 So.2d 266, 274.

Given Miller's Lake's alleged obstruction of Bayou Nezpique's waters, CV Land seeks not only damages associated with the obstruction to the natural servitude existing in its own favor, but CV Land broadly seeks a permanent injunction enjoining Miller's Lake from impeding the flow of Bayou Nezpique. CV Land seeks a corresponding order for the immediate restoration of the natural flow of water in Bayou Nezpique across the CV Land estate. With both the running waters and the bed of Bayou Nezpique firmly established as public things owned by the state, the public interest is foundational to CV Land's claim.

Moreover, it is clear that private landowners are further subject to legal servitudes affecting their property. Louisiana Civil Code Article 659 provides that "[l]egal servitudes are limitations on ownership *established by law for the benefit of*

11

*the general public* or for the benefits of particular persons." (Emphasis added.) Louisiana Civil Code Article 667 recognizes, in part, that:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage caused could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

In crafting its claim, CV Land references principles surrounding public things indicating that Mr. Miller, as the predecessor in title to both tracts, did not and could not have purchased either the running waters or the bed of Bayou Nezpique. Both are identified as public things owned by the state and thus not subject to private ownership. *See* La.Civ.Code art. 450; La.R.S. 9:1101. Neither could Mr. Miller or his heirs or assigns have encumbered by sale, succession, or by acquisitive prescription the ownership of the waters or the bed passing through this tract of land. Nor could they have established a servitude over the bed of Bayou Nezpique.

Simply, as advanced by the claims of CV Land's petition, Mr. Miller, his heirs, and his assigns had no ownership interest in these public things. La.Civ.Code art. 450 ("Public things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore."). As seen above, while "[l]egal and natural servitudes may be altered by agreement of the parties[,]" such an agreement is only possible "if the public interest is not affected adversely." La.Civ.Code art. 729. *See also* La.Civ.Code art. 7 ("[p]ersons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity.").

While CV Land insists that it does not challenge the legality of Miller's Lake or its levee system per se, the importance the law places on public things is seen in La.Civ.Code art. 458, again providing:

> *Works built without lawful permit on public things*, including the sea, the seashore, and the bottom of natural navigable waters, or on the banks of navigable rivers, *that obstruct the public use may be removed at the expense of the persons who built or own them at the instance of the public authorities, or of any person residing in the state*.
>
> The owner of the works may not prevent their removal by alleging prescription or possession.

(Emphasis added.)

Despite CV Land's allegation that the works by Mr. Miller have integrated and incorporated the bed of Bayou Nezpique, a public thing, this record does not indicate that these works have been permitted by the state or any political subdivision. The record instead demonstrates that these works were initially constructed for the private use of the Miller estate. How those works may ultimately be shown to negatively impact the natural flow of water is not demonstrated in the record and is not an issue now before this court.[5] Those considerations remain for trial on the merits.

It is firmly established, however, that CV Land's claim pleads the public nature of the waters of Bayou Nezpique. Such characterization negates the suggestion that CV Land's right to pursue its cause of action has prescribed. Rather, no individual can acquire ownership of public things owned by the state through prescription. *See* La.Const. art. 9, § 4; La.Const. art. 12, § 13. *See also Carrollton Land Co.*, 60 So. 695.

---

[5] Miller's Lake maintains that the natural flow of Bayou Nezpique is not obstructed in full as water runs from one of the spillways at times of the year.

Neither do we find merit in Miller's Lake's contention that CV Land's claim is prohibited by the subsequent purchaser doctrine as enunciated in *Eagle Pipe,* 79 So.3d 246. In *Eagle Pipe*, the supreme court plainly addressed a landowner's personal right to pursue a claim against a tortfeasor, not a real right regarding property as advanced in this case. Furthermore, as CV Land advances a claim pertaining to public things, Miller's Lake's contention that CV Land or its ancestors relinquished or altered those rights must fail. Instead, La.Civ.Code art. 729 provides that "[l]egal and natural servitudes may be altered by agreement of the parties if the public interest is not affected adversely." CV Land's petition's questioning of Miller's Lake's capture of public things patently implicates the public interest.

Whether the riparian rights in question are derived from a natural servitude or from a legal servitude is unclear in our jurisprudence. What is crystal clear in our civil code is that these servitudes implicate the "public interest" and concern a "public thing". The great scholar of the code, Planiol,[6] took the view that riparian rights are "sui generis" real rights. As such, they are fundamental to the ownership of a riparian estate. We take the same view here. The implications of the "public interest" and the conservation of a "public thing" require us to do so.

Mindful that any doubt as to whether a right of action exists must be resolved in favor of the plaintiff, we reverse the trial court's dismissal of CV Land's claim. *See Rebel Distrib. Corp., Inc. v. LUBA Workers' Comp.*, 13-749 (La. 10/15/13), 144 So.3d 825.

---

[6] *See* A.N. Yiannopoulos & Ronald J. Scalise, Jr., 4 La. Civ. L. Treatise: Property § 2:8 (4th ed. 2023), *citing* 3 Planiol et Ripert, Traité pratique de droit civil français 494 (2d ed. Picard 1952).

**DECREE**

For the foregoing reasons, the trial court's December 9, 2022 judgment sustaining the exception of no right of action filed on behalf of Defendant/Appellee Miller's Lake, LLC is reversed. This matter is remanded for further proceedings. Costs of this proceeding are assigned to Defendant/Appellee, Miller's Lake, LLC.

**REVERSED AND REMANDED.**